## SECURITIES AND EXCHANGE COMMISSION, Plaintiff,

v.

## David E. LIPSON, Defendant.

### No. 97–CV–2661.

United States District Court,
N.D. Illinois,
Eastern Division.

Jan. 11, 2001.

---

Gregory Paul Von Schaumburg, Securities & Exchange Commission, Chicago, IL, James A. Kidney, Robin W Sardegna, Securities & Exchange Commission, Washington, DC, for Securities and Exchange Commission, plaintiff.

Kathleen Helen Klaus, Marlene Ann Gibson, D'Ancona & Pflaum, Chicago, IL, Dean A. Dickie, Rooks, Pitts & Poust, Chicago, IL, Lowell E. Sachnoff, Sachnoff & Weaver, Ltd., Chicago, IL, for David E Lipson, defendant.

*ORDER AND FINAL JUDGMENT OF PERMANENT INJUNCTION, DISGORGEMENT, PREJUDGMENT INTEREST AND PENALTIES AS TO DEFENDANT DAVID E. LIPSON*

GUZMAN, District Judge.

This civil action came before the Court on a Complaint filed by the Securities and Exchange Commission ("Commission") alleging that the defendant, David E. Lipson ("Lipson"), committed securities fraud by

selling a total of 365,000 shares of Supercuts, Inc. common stock on four occasions in March and April 1995 while he was in possession of material, non-public information that in May 1995 Supercuts would announce disappointing earnings for the first quarter. At the time of these sales, the defendant was the chairman and chief executive officer of Supercuts. The Complaint alleged that the defendant avoided losses of $621,875, which he would have incurred had he sold the stock after the disappointing earnings news was announced to the public and the price of Supercuts stock fell by 15 percent.

Based on these allegations of insider trading, the Complaint alleged that Mr. Lipson violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b–5 thereunder [17 C.F.R. § 240.10b–5].

In addition, the Complaint alleged that Mr. Lipson, as an officer, director and holder of more than 10 percent of Supercuts stock, was obliged to report the four insider sales transactions to the Commission, but failed to do so, in violation of Section 16(a) of the Exchange Act [15 U.S.C. § 78p(a) ] and Rules 16a–2 and 16a–3 thereunder [17 C.F.R. §§ 240.16a–2 and 240.16a–3].

The defendant demanded that the issue of liability on the Secs. 17(a) and 10(b) and Rule 10b–5 allegations be determined by a jury. The parties agreed that liability on the Sec. 16(a) and Rule 16a–2 and 16a–3 reporting allegations should be decided by the Court.

On April 26, 2000, following an 11–day trial, the jury returned a verdict finding the defendant liable for securities fraud with respect to all four sales of Supercuts stock as alleged in the Complaint. Defendant's motion for judgment as a matter of law was orally denied immediately after the verdict was rendered. Thereafter, on May 5th, defendant filed its renewed motion for judgment as a matter of law.

That motion, now fully briefed, is hereby denied.

The parties have submitted legal memoranda on the issue of liability on the Sec. 16(a) and Rule 16a–2 and 16a–3 reporting allegations. We find the evidence has established that Mr. Lipson was an officer, director, and a holder of more than 10 percent of Supercuts Inc. stock at the time of the sales. He personally orchestrated, controlled and determined the timing and manner of the four sales of stock in question and personally benefitted from the proceeds of such sales. As such he was required under Section 16(a) of the Exchange Act [15 USC Section 78p(a)] to report the four sales transactions through his sons account to the Commission. He failed to do this and thus we find he also violated the reporting requirements under Section 16(a) of the Exchange Act and Rules 16a–2 and 16a–3 [17 C.F.R. §§ 240.16a–2 and 240.16a–3].

Relief is to be determined by the Court, because it is either equitable in nature (injunction, disgorgement and prejudgment interest) or is the responsibility of the Court pursuant to statute (civil penalties pursuant to Sec. 21A of the Exchange Act, 15 U.S.C. § 78u– 1).

The Court has entered Findings of Fact and Conclusions of Law in support of this Order and Final Judgment, which are incorporated herein by reference. The 'Court finds that the plaintiff has made a proper showing under Sec. 20(a) of the Securities Act [15 U.S.C. § 77t(a)] and Secs. 21(d) and (e) of the Exchange Act [15 U.S.C. §§ 78u(d) and (e)] entitling it to a permanent injunction against Mr. Lipson for violations of the antifraud and reporting statutes as alleged in the Complaint. The Court also finds that the defendant should disgorge the full amount of losses avoided by selling Supercuts stock before public announcement of disappointing earnings, as measured by the difference between the price at which the defendant sold Supercuts stock and the price of Supercuts stock at the close of the markets

on May 12, 1995, the day on which the poor earnings were announced. The Court also finds that prejudgment interest should be paid upon the disgorged amount for the period from April 19, 1995, the date of the last of the four stock sales, to and including August 1, 2000, based on the Internal Revenue Service underpayment interest rate, 26 U.S.C. § 6621(a)(2).

Finally, the Court finds that a civil penalty of three times the amount of losses avoided is appropriate in this case given the defendant's high rank and responsibilities to shareholders at Supercuts, the fact that the jury found the law to have been violated on four separate occasions, the failure of the defendant to take responsibility for his actions or to express remorse, the deterrent effect of such a sanction in light of the defendant's wealth and ability to pay, and the absence of any other legal forum in which sanctions are likely to be imposed.

## I

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED** that Defendant David E. Lipson, his agents, servants, employees, attorneys-in-fact and all those persons having active concert and participation with them who receive actual notice of this Final Judgment by personal service or otherwise, and each of them, be and they hereby are permanently restrained and enjoined from violating Section 10(b) of the Securities Exchange Act of 1934 [15 U.S.C. § 78j(b) ] and Rule 10b–5 promulgated thereunder [17 C.F.R. § 240.10b–5], directly or indirectly, through the use of any means or instrumentality of interstate commerce or of the mails, or of the facilities of a national securities exchange, by:

(1) employing any device, scheme, or artifice to defraud,

(2) making any untrue statement of a material fact or omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or

(3) engaging in any transaction, act, practice, or course of business which operates or would operate as a fraud or deceit on any person, in connection with the purchase or sale of any security.

## II

**IT IS HEREBY FURTHER ORDERED, ADJUDGED AND DECREED** that Defendant David E. Lipson, his agents, servants, employees, attorneys-in-fact and all those persons having active concert and participation with them who receive actual notice of this Final Judgment by personal service or otherwise, and each of them, be and they hereby are permanently restrained and enjoined from violating Section 17(a) of the Securities Act of 1933 [15 U.S.C. § 77q(a)], directly or indirectly, through the use of any means or instrumentality of transportation or communication in interstate commerce, or use of the mails, to:

(1) employ any device, scheme, or artifice to defraud;

(2) obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

(3) engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon a purchaser.

## III

**IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED** that Defendant David E. Lipson, his agents, servants, employees, attorneys-in-fact, and all those persons having active concert and participation with them who receive notice of this Final Judgment by personal service or otherwise, and each of them, be and they hereby are permanently

restrained and enjoined from violating Section 16(a) of the Securities Exchange Act of 1934 [15 U.S.C. § 78p(a) ] and Rules 16a–2 and 16a–3 promulgated thereunder [17 C.F.R. §§ 240.16a–2 and 16a–3], directly or indirectly, by:

(1) with respect to any class of any equity security that is registered pursuant to section 12 of the Securities Exchange Act of 1934 of which Lipson is the beneficial owner of more than 10 per cent of the class or is an officer or director of the issuer, failing to file with the Commission and with any national securities exchange on which such security is registered, within ten days after Lipson becomes such a beneficial owner, officer, or director, a statement on Form 3 [17 C.F..R. § 249.103] of the amount of all equity securities of such issuer of which he is the beneficial owner; or

(2) with respect to any class of any equity security that is registered pursuant to section 12 of the Securities Exchange Act of 1934 of which Lipson is the beneficial owner of more than 10 per cent of the class or is an officer or director of the issuer, failing to file with the Commission and with any national securities exchange on which such security is registered, within ten days after the close of any calendar month in which there was any change in Lipson's beneficial ownership of such securities, a statement on Form 4 [17 C.F.R. § 104] indicating his ownership of such securities at the close of the calendar month and such changes in his ownership as have occurred during such month.

## IV

IT IS HEREBY FURTHER ORDERED, ADJUDGED AND DECREED that Defendant David E. Lipson pay a total of $2,835,597 consisting of: (a) $621,875, representing disgorgement of profits predicated on the acts alleged in the complaint, (b) prejudgment interest thereon of $348,097; and (c) $1,865,625, representing a penalty pursuant to Section 21A of the Exchange Act predicated on the acts alleged in the Complaint. Payment of $2,835,597 shall be made within fifteen (10) days of the entry of this FINAL JUDGMENT as described in paragraphs V and VI below.

## V

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that payment of $969,972 of the amount described in paragraph IV, representing disgorgement and prejudgment interest, shall be made into the registry of this Court by certified check or money order to the order of "Clerk, United States District Court, N.D.Ill." within 10 days after receipt of this Final Judgment by counsel for Defendant Lipson, accompanied by a letter explaining that the deposit is made in partial satisfaction of this judgment and identifying the name of the action and the civil action number. At the same time payment is remitted, defendant Lipson shall send a photocopy of his check or money order to the Secretary of the Commission at the following address:

Office of the Secretary

Securities and Exchange Commission

450   Fifth Street, N.W.,

Mail Stop 6–9

Washington, D.C. 20549–0609

The photocopy shall be accompanied by a letter that identifies Lipson as the defendant in this action, the civil action number assigned to the Complaint, the District Court in which the Complaint and this Final Judgment were filed, and the Commission's internal case number (HO–3146). Copies of all such letters to the Court and to the Secretary of the Commission shall be sent simultaneously to counsel of record for the Commission, James A. Kidney, Esq., Assistant Chief Litigation Counsel, 450 Fifth Street, N.W., Mail Stop 8–8, Washington, D.C. 20549–0808.

## VI

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that payment of the remaining $1,865,625 of the amount described in paragraph IV, representing payment of a penalty, shall be made to the Comptroller of the Securities and Exchange Commission, who shall forward said amount to the United States Treasury. Defendant Lipson shall make such payment by certified check or money order to the order of "Comptroller, United States Securities and Exchange Commission" within 10 days after receipt of this Final Judgment by counsel for Defendant Lipson, accompanied by a letter explaining that the deposit is made in partial satisfaction of this judgment and identifying Mr. Lipson as the defendant in this action, the civil action number assigned to the Complaint, the District Court in which the Complaint and this Final Judgment were filed, and the Commissions's internal case number (HO–3146). Payment shall be sent to the following address:

Office of the Comptroller
United States Securities and Exchange Commission
450 Fifth St., N.W.
Stop 0–3
Washington, D.C. 20549–0303

At the same time payment is remitted, defendant Lipson shall send a photocopy of his check or money order and correspondence to the Secretary of the Commission and to Mr. Kidney at the addresses identified in paragraph V above.

## VII

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that upon receipt of any monies paid into the registry of this Court pursuant to Paragraph V above, the Financial Deputy Clerk shall deposit such checks or money orders into an interest bearing account, with interest earned on the money accredited to the account, and such costs and fees as may be incurred deducted from the account as required by the Financial Deputy Clerk. The Commission may prepare and submit a plan of distribution for the Court's con-

sideration. Such plan may provide for the appointment of a Fund Administrator to conserve the funds in the Account and to oversee a Court-approved plan of distribution to persons having valid claims under the federal securities laws arising out of the activities alleged in ʼthe Complaint or may call for payment of the funds to the Treasury of the United States. At such time as a Fund Administrator may be appointed, the Clerk of the Court shall transfer the funds from the registry of the Court to the control of the Fund Administrator upon the Administrator's request. Irrespective of the submission of a plan of distribution or appointment of a Fund Administrator, the Commission may move the Court for the appointment of a Tax Accountant to prepare and file appropriate tax returns for the Fund.

## VIII

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that this Court shall retain jurisdiction of this action for all purposes, including the implementation and enforcement of this Final Judgment.

## IX

There being no reason for delay, the Clerk of the Court is hereby directed to enter this Final Judgment forthwith.

### *FINDINGS OF FACT AND CONCLUSIONS OF LAW*

#### INTRODUCTION

This cause came before the court on a complaint filed by the Securities And Exchange Commission alleging that defendant David E. Lipson committed securities fraud by selling 365,000 shares of Supercuts Inc. common stock on four separate occasions in March and April of 1995 while he was in possession of material non-public information regarding the disappointing earnings of Supercuts Inc. for the first quarter. In addition, the complaint al-

leged that Mr. Lipson, as an officer, director and holder of more than 10 percent of Supercuts stock, was required to report the four insider sales transactions to the commission, but failed to do so, in violation of section 16(a) of the Exchange Act [15 USC section 78p(a)] and Rules 16a–2 and 16a–3 thereunder [17 CFR Sections 240.16a–2 and 240.16a–3]. The defendant demanded that the issue of liability as to the alleged violations of Sections 17(a) and 10(b) and Rule 10b–5 be determined by a jury. The parties agreed that liability as to the alleged violations of Section 16(a) and Rule 16a–2 and 16a–3 should be decided by the court. In addition, the question of the relief to be granted to the plaintiff is to be determined by the court because it is either equitable in nature (injunction, disgorgement and prejudgment interest) or is the responsibility of the court pursuant to statute (civil penalties pursuant to Section 21A of the Exchange Act, 15 USC section 78u–1).

On April 26, 2000, following an 11 day trial, a jury found that Mr. Lipson violated section 17(a) of the Securities Act of 1933 [15 USC section 77q(a)], Section 10(b) of the Securities Exchange Act of 1934 [15 USC Section 78j(b)], and Rule 10b – 5 promulgated thereunder (17 CFR 240.10b–5) when he sold 365,000 shares of Supercuts Inc. stock in four separate transactions through an account in the name of the defendant's son, Laurence Lipson. In his defense Mr. Lipson asserted that he did not read or pay attention to the financial reports submitted to him which reflected the current financial performance of the company because he believed such reports to be inaccurate, that he was not fully knowledgeable about the financial performance of the company, that the sale of the stock which he executed or caused to be executed was not for the purpose of avoiding losses, but rather a part of a pre-existing estate plan, and, finally, that the anticipated price of Supercuts Inc. stock after the announcement of the poor earn-

ings was not a factor in his determination to sell the stock prior to such an announcement. These theories of defense were necessarily rejected by the jury in its findings for the plaintiff. The jury obviously concluded that Lipson timed the sales of Supercuts' stock on the basis of the material non-public information he possessed and realized a benefit therefrom. We agree. And indeed, the record clearly reflects sufficient evidence upon which the jury could determine that Mr. Lipson's testimony and that of his attorney and accountants in support of these theories was not credible. Defendant's motion for judgment as a matter of law was orally denied immediately after the verdict was rendered. Thereafter, on May 5th, defendant filed its renewed motion for judgment as a matter of law. That motion, now fully briefed, is hereby denied.

The case now comes before the court for a determination on the questions of liability as to the alleged violations of Section 16(a) and Rule 16a–2 and 16a–3 and the appropriate relief to be granted plaintiff. The parties have provided legal memoranda as to liability for the alleged violations of Section 16(a) and Rule 16a–2 and 16a–3 and have submitted the issue to the court. On June 14th and again on June 21st evidence was heard with regard to the issue of damages. That issue was subsequently fully briefed and is now before the court.

## FINDINGS AND CONCLUSIONS

Defendant, David E. Lipson, is 62 years old. He grew up on the northwest side of Chicago and is currently self employed as a merchant banker. He testified that, while he has no present plans for retiring, he has health problems and believes he has remaining only "a few years" of working. He was at all times relevant to this matter the Chief Executive Officer and Chairman of the Board of Supercuts Inc.[1] During

---

1. Lipson's positions as chairman and chief executive officer were terminated on Jan. 4, 1996.

most of the relevant time Mr. Lipson owned nearly 20 percent of the stock of Supercuts Inc. As compensation for these positions Mr. Lipson was paid, in 1994, $300,000 in salary and $155,000 in expenses. Mr. Lipson is a certified public accountant with a degree in law and was a tax partner for 25 years at Arthur Andersen. He was also vice president and chief financial officer of Beatrice Foods, a multi billion dollar publicly traded company. Other than his experience at Supercuts and Beatrice, Mr. Lipson has never been an officer, director or controlling shareholder of a public company. After leaving Beatrice Foods he became a merchant banker buying and selling middle-market companies. His net worth as of June 2000 was over $100 million. Mr. Lipson has a high degree of sophistication in financial matters. He owns, through his partnerships, ranches in Colorado, Oklahoma, and Montana, but owns no personal property directly, treating even his living space as a partnership investment.

The evidence also established that Mr. Lipson was an officer, director, and a holder of more than 10 percent of Supercuts Inc. stock at the time of the sales. He personally orchestrated, controlled and determined the timing and manner of the four sales of stock in question and personally benefited from the proceeds of such sales. As such he was required under Section 16(a) of the Exchange Act [15 USC Section 78p(a)] to report the four sales transactions through his sons account to the Commission. He failed to do this and thus we find he violated Section 16(a) of the Exchange Act and Rules 16a–2 and 16a–3.

On May 12, after Lipson's sales of stock, Supercuts Inc. issued a press release disclosing to the public that its earnings for the first quarter of 1995 were 7 cents per share compared to 16 cents per share reported for the first quarter of 1994 and well below the Wall Street projections of 17 to 19 cents per share. After this announcement, at the end of the day, Supercuts' share price dropped to $7.625, a 15 percent decline from the previous day's closing price of $9 per share. Dean Witter, one of the key analysts following Supercuts stock, reduced its recommendation on Supercuts to a "swap" on the same day. This meant that it was recommending to its customers that they should sell Supercuts stock for something more promising. Dean Witter also noted that this was Supercuts' "third straight quarterly earnings disappointment" and described an investment in Supercuts as "dead money at best." The persons who purchased Mr. Lipson's shares of stock had no way of anticipating this turn of events because they did not know what Mr. Lipson new when he sold them the stock.

At the time of the sales Supercuts had a detailed policy statement prepared by outside counsel which described the obligations of directors and officers under the securities laws when they traded Supercuts stock. Under the heading "Insider Trading," the policy stated, in part:

> Accordingly, as an "insider" you must be exceedingly careful to assure yourself prior to any open market transactions in securities of Supercuts that at the time of the transaction, you are not (and could not reasonably be deemed to be) in possession of any material information regarding Supercuts which has not been publicly disclosed.

The policy further recommended that officers and directors not trade Supercuts stock except during a limited period beginning 48 hours after quarterly and year-end results have been announced and ending 20 days later. Lipson signed a copy of this policy statement acknowledging that he had both read and understood the statement and agreeing to comply in all respects with such a policy. During the investigation he testified that although he did sign the statement, he did so without reading it. At trial he admitted to having skimmed the policy, but again asserted that he never actually read it. In selling Supercuts stock on April 10 and April 19 Mr. Lipson violated the policy's recom-

mendation even without regard to the question of knowledge of material non-public information.

By selling Supercuts stock before the negative first quarter earnings announcement in May 1995, Mr. Lipson avoided losses of $621,875 based on the closing price of the stock the day of the announcement. Interest on this amount from April 19, 1995—the date of the last unlawful stock sale—to August 1, 2000 is $348,097 applying the IRS underpayment interest rate. The proceeds from the sale of the stock inured to the benefit of Mr. Lipson by way of entities owned and/or controlled by him.

The day after he was fired as CEO by the Board of Directors of Supercuts Inc. on Jan. 4, 1996, Mr. Lipson personally ordered yet a fifth sale of 250,000 shares of Supercuts stock through his son's account. Lipson personally called the same broker who had executed the sales of the Supercuts stock in March and April of 1995 and directed him to sell the maximum amount of Supercuts stock possible. At the time he did this Lipson was aware that Supercuts was in danger of breaching its covenants with bank lenders and going into default on its debts. He knew the Company was in the process of re-negotiating the loan terms with the bank as it had done in the past and, that as of his termination, no agreement had been reached on the extension of credit terms. Because of the difficulty in re-negotiating the credit extension there existed a substantial possibility that Supercuts Inc. would either breach its covenants with its bank lenders and go into default on its debts, or that the change in the credit extension terms would be such as to require disclosure as a material event. All of this was known to Mr. Lipson when he initiated the sale of 250,000 shares of Supercuts stock through his son's account. None of this information was public at that time. Mr. Lipson was advised by his attorney of the need to make a disclosure if the bank continued to insist on a loan termination date as a condition of extending the terms of credit. Prior to ordering the sale he asked his personal attorney, John McEnroe if he could sell the stock. In response MacEnroe asked him if he had any material inside information and, according to Lipson's testimony, after Lipson protested that he could have no such information so early in January, McEnroe nevertheless said to him "this could be criticized". Nevertheless, Lipson proceeded with the sale order. Just four days later, on Jan. 8, 1996 Supercuts issued a press release announcing that it had defaulted on its bank covenants. This announcement resulted in the largest percentage decline in Supercuts stock price from 1994 through the end of its stock trading in October of 1996. Thereupon, on the advice of still another attorney, Lipson canceled the trade he had ordered through his son's account on Jan. 10th.

■ We find the fact that Lipson proceeded to order yet another sale of Supercuts stock in the face of warnings by his own personal attorney and with the full knowledge that he had information regarding Supercuts' financial situation which the average member of the public could not possibly know, extremely troubling. This is direct evidence of the likelihood of future violations. Unfortunately this attempted fifth sale is reflective of a pattern in which Mr. Lipson puts his personal needs and desires ahead of his obligations and responsibilities under the law. Indeed, this determination, along with the totality of the evidence, leads us to believe that Mr. Lipson considers his obligations under the law no more than an inconvenience to be considered only insofar as necessary to find a convenient route by which to circumvent the law's intent. His personal attorney, Mr. McEnroe, was used precisely for this purpose. It appears from the testimony that when asked, Mr. McEnroe, would intone in a formalistic manner the legal caveat regarding material non-public information and then proceed to sanction whatever course of conduct Mr. Lipson desired. Even Mr. McEnroe, however, had obvious doubts as to the propri-

ety of this last attempted sale, although he could not bring himself to utter the word "no" to his affluent client and instead constrained himself to simply warn Mr. Lipson of likely criticism. No matter, however, Mr. Lipson was not about to be put off. As in the past, concerns voiced by legal counsel had little effect upon him.[2] It was not until the market's strong reaction to the news of Supercuts' default made it clear beyond dispute that, given his prior knowledge of Supercuts' precarious situation, the sale was not about to slip through unnoticed, that Lipson moved to cancel the sale. That Lipson was aware of possible legal difficulties is clear from the fact that he asked McEnroe if he could legally make such a sale in the first place. That he has little respect for the intent of the laws is equally clear from his failure to restrain himself in the face of clear concern from the usually compliant McEnroe.

From the beginning of the SEC investigation throughout the entirety of the liability phase of the trial Mr. Lipson has maintained his innocence and refused to acknowledge any wrongdoing or culpability of any sort for any of his actions. He has used every means at his disposal to fight, challenge, and hinder the SEC investigation. To this end he has attempted to prevent the testimony of Supercuts' counsel, Lawrence Imber, by asserting the existence of a personal attorney client privilege regarding Mr. Imber's testimony. He has publicly criticized the SEC investi-

gation and litigation regarding his actions, accusing the SEC of not acting in the best interests of the shareholders. In a settlement agreement with Supercuts' successor, Regis Corp., over separate issues, Lipson required execution by the former officers and directors of Supercuts of an agreement that prohibited them from voluntarily discussing him or any of his business entities with the SEC absent an order of Court while, at the same time, agreeing to cooperate with Lipson's attorneys.[3] To the present time Lipson continues to assert the essence of his innocence in spite of the jury's verdict. He continues to assert that he did not utilize insider information because he completely ignored and paid no attention to the interim financial reports he received from the accounting department. In fact he maintains that the entire operations department at Supercuts ignored these reports because they were perceived as useless and that he paid no attention to his own accounting department or his own chief financial officer. (*David E. Lipson's Proposed Findings of Fact and Conclusions of Law and Response to Plaintiff's Findings of Fact and Conclusions of Law*, Pars. 37–40). Clearly, the jury rejected this contention when it found Mr. Lipson liable.[4] Just as clearly, his continued assertion of this proposition reflects the fact that Mr. Lipson fails to this day to recognize the rightfulness of the jury's verdict or the wrongfulness of his conduct. This, in turn, makes it more

2. Prior to Lipson's fourth sale of stock Lawrence Imber, general counsel of Supercuts, warned Lipson that the stock sale was "foolish". Lipson paid no attention.

3. The parties are in great disagreement as to the legality of this provision in the settlement agreement. Judge Pallmeyer found this particular provision to be unenforceable as against public policy and because it interferes with the SEC's access to witnesses. However, defendant proposes a finding of fact declaring that similar confidentiality provisions have been upheld by federal courts and provides supporting citations—including Seventh Circuit caselaw. We agree with plaintiff when it points out that the issue of the legality of the procedure is largely irrelevant. The

probative value of this fact to the issues before us is that, legal or not, it tends to show Mr. Lipson's state of mind with regard to the allegations and investigation by the SEC. (To the extent it reflects the existence of or a lack of remorse or conscious understanding of the wrongfulness of his conduct it is probative of our determination, whether the tactic was a legally enforceable one or not.)

4. Mr. Lipson's assertions in this regard were severely undermined by the totality of the evidence including the fact that every member of the Supercuts Board of Directors, other than Lipson, testified that Lipson never told them he found the accounting worthless or that he never read interim financial reports prepared by accounting.

likely that, given the opportunity, he will repeat his offense. His own character witness supports this conclusion. His testimony describes a man who is totally self-reliant and extremely confident in defining his own course of conduct. In doing so he is tenacious in rejecting the differing opinions of others. The problem, of course, is that Mr. Lipson's judgment with respect to what is necessary in order to comply with the letter and intent of the securities laws and regulations has proven to be disastrous. This faulty judgment coupled with a tenacious refusal to listen to advice constitutes a formula for future violations. Unless permanently enjoined there is a greater than reasonable likelihood that Mr. Lipson will engage in future securities laws violations.

To counter this Mr. Lipson testifies that he does not intend in the future to engage in the business of purchasing, controlling, or being an officer or director of a public corporation. Unfortunately there is no way to ensure that Mr. Lipson will not change his mind next week or next month or next year. In addition, it is not necessary for Mr. Lipson to be an officer or director of a public corporation in order to be in a position to benefit from the use of inside information. For example, in the fall of 1997 Mr. Lipson, through an investment banking company known as Knightsbridge Partners of which he was the controlling partner, acquired control of Fredericks of Hollywood, a retailer in lingerie, which was a public company until acquired by Knightsbridge. Knightsbridge sold Fredericks in June of 2000. Clearly as the controlling partner of an entity that purchased Fredericks of Hollywood, Mr. Lipson was undoubtedly engaged in doing a great deal of research about this public corporation prior to its purchase. Common sense tells us that the likelihood of acquiring insider information during . such investigations and pre-purchase negotiations is great. Mr. Lipson also holds a controlling interest in numerous other private companies and partnerships including Knightsbridge Capital Corp., Knightsbridge Partners

LP, Majestic Company L.P., Roscoe Inc., TEL Corp., the DMA Corp., and DL Be Corp. All but TEL are investment companies. That opportunities for profitable investments in publicly held corporations or opportunities for profit by taking private corporations public will arise in the future for one engaged in such commerce is certain. Given the totality of the evidence and record before us Mr. Lipson's representation that he will not avail himself of such opportunities is insufficient for the protection of shareholders of public corporations.

We find that the gravity of the harm caused by this offense was sufficiently great to warrant the imposition of a permanent injunction. As the evidence clearly establishes Mr. Lipson was the CEO and chairman of the board of the very company whose shareholders he defrauded. In addition, the extent of his profit from these actions, $621,875, is great when considered in light of the fact that the stock was selling for under $10 per share. We further find, as more fully described above, that Mr. Lipson's participation in this fraudulent endeavor was extensive. He utilized lawyers and accountants in constructing a scheme to shield his unlawful use of material non-public information and even utilized a third party, his son, in order to distance himself from the sale. He also engaged in four separate transactions and attempted a fifth. As pointed out above, Mr. Lipson's customary business activities will provide him with many opportunities to involve himself in such transactions in the future. He has already taken a private company public and taken a public company private. He is one of few to have accomplished this. He has the legal and business and financial training and skill to conduct such operations as well has the capital necessary to involve himself in future transactions. Even if, as he now claims, he never again intends to actually acquire control of a public corporation, he will undoubtedly be in a position in the future to learn confidential information about public companies as he goes about

the business of looking for targets of acquisition. When coupled with an apparent total lack of remorse for the harm he has caused others the above described circumstances and considerations require us to permanently enjoin Mr. Lipson from future violations of the statutes and rules he has already violated.

Mr. Lipson must also be made to disgorge the amount of avoided losses as measured by the decline in the price of Supercuts stock on May 12 1995—that day on which the poor earnings were announced. This amounts to $621,875. Here, there is little uncertainty about the impact of the news on the price of the stock. The stock was thinly traded, much of it was in the hands of a few large institutional investors. Wall Street analysts, especially Dean Witter, quickly issued highly negative recommendations to their customers on the same day the poor earnings were announced. There followed a decline in price on the same day of the announcement that was the greatest in the history of Supercuts as a public company to that time.

■ The evidence is that most if not all of the proceeds of the sales were used either to reduce Mr. Lipson's debts, such as the mortgage on the Colorado Ranch where he lived, or to invest in interest-bearing accounts, such as money markets. In either case the money was being put to a profitable use. Fairness requires that we eliminate all gain from the violation of the securities laws. That means that Mr. Lipson must be required to pay prejudgment interest on his unlawful gains. The prejudgment interest from April 19, 1995, the date of the last unlawful stock sale, through August 1, 2000 is $348,097, based on the IRS underpayment rate, adjusted quarterly. 26 USC section 6621. By ordering both disgorgement and prejudgment interest we eliminate all profit from Mr. Lipson's unlawful conduct.

■ Removing all profit from the illegal transaction, however, provides no deterrent. It merely places the offender in the same position he would have been in had he not committed the offense. Section 21A(a)(2) of the Exchange Act provides that the court may levy of civil penalty for insider trading of up to three times the loss avoided by the trading to serve as a deterrent. Without such a deterrent the offense of insider trading would carry no risk to offset the possibility of large gains. For the reasons given above and based upon the totality of the evidence we find that the defendant's conduct requires us to impose the maximum allowable penalty in this case—$1,865,625. The defendant is clearly culpable. He not only engaged in insider trading he also engaged in a complex multifaceted scheme involving lawyers, accountants, and family members to cover up his illegal trading. The jury necessarily rejected in its entirety his evidence as to a pre-existing estate plan and his claim of lack of knowledge. He has never conceded wrongdoing, on the contrary. He engaged in more than one such sale and has exhibited a propensity to continue in such conduct. Finally, his net worth of over $100 million is large in comparison to the penalty imposed.

For the reasons set forth above the court enters an ORDER AND FINAL JUDGMENT OF PERMANENT INJUNCTION, DISGORGEMENT, PREJUDGMENT INTEREST AND PENALTIES AS TO DEFENDANT DAVID E. LIPSON of even date herewith enjoining David E. Lipson from violating the statutes and rules for which he was found liable, ordering disgorgement in the amount of $621,875, ordering payment of prejudgment interest in the amount of $348,097 and ordering payment of penalties in the amount of $1,865,625 in the manner and at the times as set forth more fully therein.

**SO ORDERED**