In the
United States Court of Appeals
For the Seventh Circuit

No. 01-1226

Securities and Exchange Commission,

Plaintiff-Appellee,

v.

David E. Lipson,

Defendant-Appellant.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 97 C 2661--Ronald A. Guzman, Judge.

Argued November 5, 2001--Decided January 9, 2002


   Before Bauer, Posner, and Ripple, Circuit
Judges.

   Posner, Circuit Judge.  David Lipson
appeals from a judgment in favor of the
plaintiff, the Securities and Exchange
Commission, that followed a jury's
verdict that he had traded stock of a
publicly traded corporation on the basis
of inside information, in violation of
the SEC's Rule 10b-5, 17 C.F.R. sec.
240.10b-5. 129 F. Supp. 2d 1148 (N.D.
Ill. 2001); see Securities Exchange Act
of 1934, sec. 10(b), 15 U.S.C. sec.
78j(b). The appeal challenges the
instructions that the judge gave the jury
on liability and the relief that he
ordered.

   Early in 1995, Lipson, at the time the
chief executive officer of Supercuts, a
chain of hair-cutting salons, learned
that Supercuts' revenues were running
lower, and its expenses higher, than
expected. The company did not make this
information public until May, and
apparently it didn't leak out. In March
and April Lipson sold 365,000 shares of
Supercuts stock owned by partnerships
that he controlled at prices in excess of
$9 per share. When the bad news was
finally announced, Supercuts' stock price
plummeted from $9 a share, the price the
day before the announcement, to $6  the
next day, though by the end of the day it

had recovered to $75/8. By selling when he did, Lipson averted a loss of hundreds of thousand of dollars.

The evidence presented at trial was overwhelming that he had inside information when he sold the shares. The jury was not required to believe his implausible testimony that he paid no attention to the financial reports that his subordinates gave him. His inside information gave him an incentive to sell his shares before the information became public because it showed that Supercuts was worth less than its market valuation. Even skeptics about the prohibition of insider trading tend to look askance at an insider who profits from the poor performance of his company-- poor performance for which he may be responsible. See Frank H. Easterbrook & Daniel R. Fischel, The Economic Structure of Corporate Law 274-75 (1991); Henry G. Manne, Insider Trading and the Stock Market 150-51 (1966); but cf. Dennis W. Carlton & Daniel R. Fischel, "The Regulation of Insider Trading," 35 Stan. L. Rev. 857, 872, 873-75 (1983).

Lipson claimed, however, that whatever he may or may not have known about Supercuts' finances and whatever the impropriety of trading on inside information, his sole motive for selling when and how many of his shares he did was to comply with an estate plan that he had set up two years earlier to transfer wealth to his son free of gift or estate tax. The plan required the son to borrow at a specified interest rate $7.5 million from a company controlled by his father and use the borrowed money to buy interests in partnerships, controlled by his father, that owned Supercuts shares. The shares owned by the partnership interests that the son would be buying were worth $10 million, but he was permitted to buy them indirectly, by buying the partnership interests, for only $7.5 million because the interests were not controlling interests and lacked liquidity. (The analogy is to a closed-end mutual fund, whose shares frequently trade at a discount from the market price of the securities owned by the fund.) For him to exploit the difference between the indirect cost of the shares to him and their market value when "liberated" from the partnerships, the partnerships had to redeem his partnership interests by

giving him shares in exchange for those interests, shares he could sell to pay down the loan. Had the value of the shares remained at $10 million, he would have ended up paying off the $7.5 million loan with $7.5 million worth of stock, thus retaining stock worth $2.5 million; and that would have been the amount of the wealth transfer from his father, as Lipson intended. Lipson and his tax accountant claimed at trial that Lipson had caused shares owned by the partnerships to be sold in 1995 solely in order to give his son cash that the son could use to pay down the loan and by doing so save some interest expense.

Lipson does not argue that no rational jury could have disbelieved his claim that he was motivated by the estate plan rather than by inside information in deciding to sell the shares. But he contends that the jury was improperly instructed on the issue. Although the jury was properly instructed that it could find a violation only if Lipson's trades had been motivated by inside information, another instruction, the one Lipson is complaining about, said that

if you find that Defendant Lipson possessed material, non-public information at the time that he sold . . . Supercuts stock, you may infer that Defendant Lipson used such information in selling . . . [it]. However, this inference may be rebutted by evidence that there was no connection between the information that the defendant possessed and the trading, in other words, that the information was not used in trading . . . . If you conclude that the trades . . . would have occurred on the same dates and involving the same amounts of stock regardless of whether Mr. Lipson possessed the inside information . . . , then you should find that Mr. Lipson did not use the inside information in selling . . . Supercuts stock.

Lipson contends that the instruction improperly shifted the burden of persuasion from the SEC to himself.

That would indeed have been improper. The weight of authority, scanty thought it is, supports the position that the Commission had the burden of persuading the jury that Lipson's trades had been influenced by the inside information that

he possessed--the burden, in other words, of proving that inside information had played a causal role in Lipson's decision to sell the shares in the amount, and when, he did. SEC v. Adler, 137 F.3d 1325, 1340 (11th Cir. 1998); United States v. Smith, 155 F.3d 1051, 1066-69 (9th Cir. 1998). A considered dictum in United States v. Teicher, 987 F.2d 112, 120-21 (2d Cir. 1993), argues to the contrary that the knowing possession of such information should be enough to base guilt on: "one who trades while knowingly possessing material inside information has an informational advantage over other traders. Because the advantage is in the form of information, it exists in the mind of the trader. Unlike a loaded weapon which may stand ready but unused, material information can not lay [sic] idle in the human brain." Id. at 120. However sensible the Second Circuit's position may seem, the Commission is not pushing it in this case, and so we need not wrestle the issue to the ground. We note, however, that several months after Lipson's trial, the Commission promulgated a regulation that is in the spirit of the Teicher dictum and also follows a suggestion in SEC v. Adler, supra, 137 F.3d at 1337 n. 33. See 17 CFR sec. 240.10b5-1(b); 65 Fed. Reg. 51716. The regulation, however, as we're about to see, preserves a diminished requirement of causality.

The last sentence of the instruction we quoted gave Lipson a safe harbor, and is unobjectionable. The new SEC regulation creates a similar safe harbor. See 17 CFR sec. 240.10b5-1(c)(1). All the last sentence of the instruction says is that if Lipson would have sold the shares in the same amounts and on the same dates that he did sell them even if he had not possessed any inside information, then he would be home free, because then the existence of a causal connection between his inside information and the challenged sales would be negated. Cf. Conn v. GATX Terminals Corp., 18 F.3d 417, 420 (7th Cir. 1994).

Lipson can't reasonably object to the first sentence, either. It allows the jury to infer that if he had inside information, the trades were influenced by it. To infer Y from X just means that, if X happened, Y probably happened. If Lipson possessed nonpublic information

which showed that Supercuts stock was overpriced, and having this information he sold a large quantity of that stock shortly before the information became public and the stock dropped sharply in value, common sense tells us that it is probable that his decision to sell when he did and how much he did (rather than sell later or sell less) was influenced by the information. SEC v. Adler, supra, 137 F.3d at 1340; 2 Alan R. Bromberg & Lewis D. Lowenfels, Securities Fraud & Commodities Fraud, sec. 7.4(625), pp. 7:160.42-45 (2d ed. Supp. 1999). The Ninth Circuit refused to allow such an instruction in a criminal case, United States v. Smith, supra, 155 F.3d at 1069, mindful of the Supreme Court's concern with the use of prosecution-favoring presumptions, see, e.g., Sandstrom v. Montana, 442 U.S. 510, 524 (1979), but did not challenge the presumption adopted in Adler for civil insider-trading cases. United States v. Smith, supra, 155 F.3d at 1069 n. 27.

The inference is sufficiently compelling to shift to a defendant in Lipson's situation the burden of production, that is, the burden of presenting some rebuttal evidence, on pain of suffering an adverse judgment as a matter of law if he does not. Allan Horwich, "Possession Versus Use: Is There a Causation Element in the Prohibition on Insider Trading?" 52 Business Lawyer 1235, 1276-77 (1997). And that is all the middle sentence in the instruction did. Lipson did present some evidence in rebuttal (the estate plan), enough to satisfy his burden of production and thus require the jury to decide whether to infer from the inside information and the timing of the trades whether his decision on when and how much to sell was indeed influenced by the information. Cf. St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506-07 (1993); Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 254-56 (1981); American Grain Trimmers, Inc. v. Office of Workers' Compensation Programs, 181 F.3d 810, 816 (7th Cir. 1999) (en banc). And so the instruction did not harm him.

Moreover, the instruction he offered to take the place of the one to which he objects was woefully inadequate and not merely, as his lawyer said at argument, "inelegant" or "inartful." It said that if the jury found that Lipson "had a

legitimate, alternative purpose for selling Supercuts securities" it would have to find in his favor. That is absurd. He might well have had two purposes, one to transfer wealth to his son and the other to avoid a loss that his inside information told him was coming. The existence of the legitimate purpose would not sanitize the illegitimate one. Sussman v. American Broadcasting Companies, Inc., 186 F.3d 1200, 1202 (9th Cir. 1999). Only if the illegitimate purpose had no causal efficacy because the legitimate one would have caused him to sell the shares when he did and in the amount he did would the existence of the legitimate purpose be a defense--as the jury was told in the last sentence of the instruction to which Lipson objects.

If the existence of an alternative legitimate purpose were a defense to a charge of insider trading, any insider who wanted to be able to engage in such trading with impunity would establish an estate plan that required him to trade in his company's stock from time to time but gave him discretion as to when and how much to trade. He could then trade on the basis of inside information yet defend on the ground that he was also trading in implementation of his estate plan. He would be doing both. Yet even to regard the good and the bad purpose as alternatives is to sugarcoat the pill. In the case just put, the insider would be using inside information to implement his estate plan more effectively. He would be like someone who robbed a bank with the intention of giving the money to charity. The noble end would not immunize the ignoble means of achieving that end from legal punishment.

We turn to remedy. Because the SEC was seeking both legal and equitable relief (the former under the Insider Trading Sanctions Act, 15 U.S.C. sec. 78u-1, which (in subsection (a)(1)) authorizes the imposition of civil penalties for insider trading at the suit of the SEC, the latter under section 21(d) of the Securities Exchange Act of 1934, 15 U.S.C. sec. 78u(d)), Lipson was entitled to and received a jury trial. Tull v. United States, 481 U.S. 412, 425 (1987); Senn v. United Dominion Industries, Inc., 951 F.2d 806, 813-14 (7th Cir. 1992); Hohmann v. Packard Instrument Co., 471

F.2d 815, 819 (7th Cir. 1973). SEC v. Clark, 915 F.2d 439, 442 (9th Cir. 1990), assumed, but without discussion, and we think erroneously, that civil penalties in SEC cases are not a form of legal relief.

But it was for the judge to decide, consistent with the jury's finding of liability, not only what equitable relief to impose, but also the amount of the civil penalty. The first point is obvious, the second not. The statute does not say that the judge is to decide the amount of the penalty, but the parties have so assumed, as did the court in Clark, though it did so for the wrong reason--that civil penalties are equitable, which they are not. The Seventh Amendment does not forbid Congress to assign the determination of liability and damages to jury and judge, respectively, in a single case, Tull v. United States, supra, 481 U.S. at 425-27, at least where the suit is brought by, and an award will be paid to, the government, Feltner v. Columbia Pictures Television, Inc., 523 U.S. 340, 354-55 (1998); and in view of the parties' agreement that the Insider Trading Sanctions Act does assign the determination of the civil penalty under the Act to the judge, see also Ralph C. Ferrara et al., "Hardball! The SEC's New Arsenal of Enforcement Weapons," 47 Business Lawyer 33, 47 (1991); cf. Tull v. United States, supra, 481 U.S. at 425-27, we need not pursue the issue.

The judge permanently enjoined Lipson from violating the relevant provisions of the securities laws, ordered him to disgorge $621,875 (the court's estimate of the loss his insider trading had avoided) plus prejudgment interest of $348,097, and imposed punitive damages of $1,865,625, which was equal to three times the amount ordered disgorged and was the maximum civil penalty permitted by the Insider Trading Sanctions Act. 15 U.S.C. sec. 78u-1(a)(2).

Disgorgement in SEC cases has been assumed to be an equitable remedy. Dasho v. Susquehanna Corp., 461 F.2d 11, 24 (7th Cir. 1972); SEC v. Rind, 991 F.2d 1486, 1493 (9th Cir. 1993); SEC v. Commonwealth Chemical Securities, Inc., 574 F.2d 90, 94-96 (2d Cir. 1978) (Friendly, J.); SEC v. Manor Nursing

Centers, Inc., 458 F.2d 1082, 1104 (2d Cir. 1972). Otherwise the SEC could not seek it under section 21(d) of the '34 Act, a provision limited to equitable relief. Disgorgement is another name for restitution, as Judge Friendly noted in SEC v. Commonwealth Chemical Securities, Inc., supra, 574 F.2d at 95, and restitution, as we have noted in several non-SEC cases, is both a legal and an equitable remedy. Clair v. Harris Trust & Savings Bank, 190 F.3d 495, 498 (7th Cir. 1999); Health Cost Controls of Illinois, Inc. v. Washington, 187 F.3d 703, 710 (7th Cir. 1999); Reich v. Continental Casualty Co., 33 F.3d 754, 756 (7th Cir. 1994). It is "a legal remedy when ordered in a case at law and an equitable remedy (rather than a legal remedy pressed into service to provide complete relief in an equity case--the rationale of the 'clean up' doctrine) when ordered in an equity case." Id. Trading on insider knowledge by a major shareholder who is also the corporation's chief executive officer is a breach of fiduciary obligation, Chiarella v. United States, 445 U.S. 222, 227-28, 232-33 (1980); Fry v. UAL Corp., 84 F.3d 936, 938 (7th Cir. 1996); SEC v. Maio, 51 F.3d 623, 631 (7th Cir. 1995); SEC v. Clark, supra, 915 F.2d at 443; 3 Bromberg & Lowenfels, supra, sec. 7.5(300), pp. 7:205-06, and so the disgorgement of the insider's ill-gotten gain (or averted loss, which is the economic equivalent of profit) is indeed equitable in character. Cf. Clair v. Harris Trust & Savings Bank, supra, 190 F.3d at 498. The same is true, incidentally, with regard to prejudgment interest: it's a legal remedy when the award to which it is attached is legal, and an equitable remedy when, as in this case, the award to which it is attached is equitable. Kerr v. Charles F. Vatterott & Co., 184 F.3d 938, 946 (8th Cir. 1999). For the interest was on the amount disgorged--though, since the judge determines the amount of the civil penalty, we suppose that he also determines the amount of any prejudgment interest on that penalty.

It may be worth noting that the district court's judgment required Lipson to pay four times rather than three times the amount of the loss that he avoided. The Insider Trading Sanctions Act does not create a conventional treble-damages remedy; compare Clayton Act, sec. 4, 15

U.S.C. sec. 15. While measuring the amount of the civil penalty by the loss avoided (or profit gained, as the case may be), the Act preserves the right of the SEC to seek other remedies. 15 U.S.C. sec. 78u-1(d)(3). The other remedies include equitable remedies obtainable under section 21(d) of the '34 Act, such as disgorgement. Because the other remedies thus are additive to the civil penalty, there was no double counting in awarding the Commission the maximum civil penalty of three times the loss avoided. See H.R. Rep. No. 910, 100th Cong., 2d Sess. 40 n. 16 (1988).

The judge estimated the amount of that avoided loss by subtracting from the price at which Lipson had sold shares during the period in which he had inside information (March and April 1995) the closing price of Supercuts' stock on Friday, May 12, the day the information became public. Lipson argues that the judge should have used the closing price on the next trading day, May 15, in order to allow the shock value of the announcement to dissipate. The Insider Trading Sanctions Act defines "loss avoided" as the difference between the sale price of a security and its value as measured by its price "a reasonable period after public dissemination of the nonpublic information." 15 U.S.C. sec. 78u-1(f). But the price on May 15 was a spike--$8. The closing price on the twelfth, the price the court used, had been $75/8. On May 16, the closing price was $7, and on each of the following two days it was $7. Lipson gives us no reason to think that the closing price on May 15 is a more accurate snapshot of the market value of the stock than the price on May 12, 16, 17, or 18. He does not point to any circumstances unrelated to the public disclosure of the (formerly) inside information that might have depressed the price on the twelfth or the sixteenth.

He next objects that in imposing the maximum penalty, the district court was influenced by the fact that he steadfastly maintained his innocence and claimed to be the victim of a government vendetta. He says that to allow such factors to influence punishment violates due process of law and the First Amendment to boot. He seems unaware that acceptance of responsibility for illegal

conduct is a routine and unexceptionable feature even of criminal, let alone of civil, punishment. U.S.S.G. sec. 3E1.1; United States v. Lopinski, 240 F.3d 574, 575-76 (7th Cir. 2001); United States v. Wells, 154 F.3d 412, 413-14 (7th Cir. 1998). The criminal who in the teeth of the evidence insists that he is innocent, that indeed not the victims of his crime but he himself is the injured party, demonstrates by his obduracy the likelihood that he will repeat his crime, and this justifies the imposition of a harsher penalty on him. E.g., United States v. Lopinski, supra, 240 F.3d at 575; United States v. Stewart, 198 F.3d 984, 987 (7th Cir. 1999). It makes no difference whether, as in this case, the government is seeking only a civil remedy. See SEC v. Holschuh, 694 F.2d 130, 144-45 (7th Cir. 1982); SEC v. McNulty, 137 F.3d 732, 741 (2d Cir. 1998); SEC v. Lorin, 76 F.3d 458, 461 (2d Cir. 1996) (per curiam). The evidence against Lipson was overwhelming, and his insistence in the face of it that he is a shorn sheep argues for heavy punishment to bring him to his senses.

He complains that the judge failed to consider the penalties meted out by other district judges in other cases. Comparison shopping of that sort is doubtless a good practice in cases in which there is no statutory limit on punitive damages, see, e.g., Cooper Industries, Inc. v. Leatherman Tool Group, Inc., 121 S.Ct. 1678, 1684-85 (2001); BMW of North America, Inc. v. Gore, 517 U.S. 559, 583-85 (1996); Cooper v. Casey, 97 F.3d 914, 920 (7th Cir. 1996); DeRance, Inc. v. PaineWebber Inc., 872 F.2d 1312, 1329 (7th Cir. 1989), just as it is a good practice in cases involving damages for pain and suffering, when as is usually the case there is no statutory ceiling. See, e.g., Jutzi-Johnson v. United States, 263 F.3d 753, 760-61 (7th Cir. 2001); Seidman v. American Airlines, Inc., 923 F.2d 1134, 1141 (5th Cir. 1991); Wulf v. City of Wichita, 883 F.2d 842, 874-75 (10th Cir. 1989). For neither calculating punitive damages nor calculating damages for pain and suffering is formulaic, and so comparison is a valuable and sometimes (as we suggested in Jutzi-Johnson v. United States, supra, 263 F.3d at 759) an essential check on extravagance, subjectivity, and abuse. It is much less

needful in a case such as this in which the damages are capped. Caudle v. Bristow Optical Co., 224 F.3d 1014, 1028 n. 10 (9th Cir. 2000); EEOC v. W&O, Inc., 213 F.3d 600, 617 (11th Cir. 2000). Even in such a case, the obviously trivial character of a violation might argue compellingly for less than the maximum. Hennessy v. Penril Datacomm Networks, Inc., 69 F.3d 1344, 1355-56 (7th Cir. 1995) (as interpreted in EEOC v. Indiana Bell Telephone Co., 214 F.3d 813, 822 n. 4 (7th Cir. 2000), vacated on other grounds upon the grant of rehearing en banc); Luciano v. Olsten Corp., 110 F.3d 210, 220-21 (2d Cir. 1997). But that would not be an apt characterization of Lipson's violation. Given his wealth (we were told without contradiction that he has a net worth of some $100 million), the flagrancy of his violation, and the obduracy that we've mentioned, the judge did not need any boost from other judges to decide that the maximum penalty was deserved.

Affirmed.