# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 14-51353

United States Court of Appeals
Fif h Circuit

**FILED**
April 21, 2017

Lyle W. Cayce
Clerk

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff - Appellee Cross - Appellant

v.

LIFE PARTNERS HOLDINGS, INCORPORATED,

Defendant - Appellant

BRIAN D. PARDO; R. SCOTT PEDEN,

Defendants - Appellants Cross - Appellees

Appeals from the United States District Court
for the Western District of Texas

Before STEWART, Chief Judge, and JONES and DENNIS, Circuit Judges.

JAMES L. DENNIS, Circuit Judge:

The Securities and Exchange Commission (SEC) brought this enforcement action against Life Partners Holdings, Inc. (LPHI) and two of its senior officers, Brian Pardo and Scott Peden, alleging violations of reporting and anti-fraud provisions of the federal securities laws. LPHI is in the business of facilitating the sales of existing life insurance policies to investors. The SEC alleges that LPHI knowingly underestimated life expectancies for the insureds in public filings with the SEC.

No. 14-51353

Relevant to this appeal, a jury found the defendants liable for violations of section 17(a) of the Securities Act of 1933 and section 13(a) of the Securities Exchange Act of 1934. The district court sustained the jury's verdict as to section 13(a) but set aside the verdict as to section 17(a). In its final judgment, the district court imposed civil penalties on the defendants and issued injunctions restraining them from committing additional violations of the relevant securities laws. However, the district court declined to order Pardo to reimburse LPHI for compensation under section 304 of the Sarbanes-Oxley Act. The appellants, Pardo and Peden, challenge both the jury's verdict and the district court's judgment. The SEC cross-appeals, challenging the court's judgment.

**I**

LPHI is a publicly held company that, through its wholly owned subsidiary, Life Partners, Inc. (LPI),[1] engaged in the business of facilitating "viatical" and "life settlement" transactions.[2] Pardo is LPHI's majority shareholder, and, during the time relevant to this appeal, he was also the chairman of the board of directors and chief executive officer of both LPI and LPHI. Peden was president of LPI, general counsel of both LPI and LPHI, and a director of LPHI. As officers of LPHI and LPI, both Pardo and Peden participated in creating the various reports filed by LPHI with the SEC, and they both signed, and Pardo certified, the filed reports.

---

[1] LPI's activity constituted LPHI's entire business activity. For purposes of this appeal, there is no meaningful difference between the two entities; therefore, this opinion refers to both entities as LPHI, unless otherwise noted.

[2] A viatical settlement is the sale of an existing life insurance policy on the life of an individual with a terminal illness. A life settlement is the sale of an existing life insurance policy on the life of an individual who is at least sixty-five years old and has a life expectancy of ten years or less but does not have a terminal illness.

No. 14-51353

LPHI derived its revenue from commission fees it collected when facilitating the sale of existing life insurance policies or fractional interests in such policies to individual and institutional investors. In a typical transaction, the life insurance policy owner, the insured, sold the policy for an amount less than the death benefit but more than the cash surrender value of the policy. The purchaser of the policy undertook to pay future premiums to maintain the policy until the insured died. Thus, the purchaser would realize a profit if, when the policy matured upon the death of the insured, the policy benefits paid were greater than the purchase price plus any additional costs, including the premiums paid by the purchaser to maintain the policy. An insured's life expectancy estimate (LE) was therefore of critical importance in determining the policy's sale price. And, if an insured lived longer than expected, thereby increasing the cost of maintaining the policy, the purchaser received a lower return or even lost money.

LPHI evaluated policies, obtained LEs for each policy, and determined the sale price, from which it received its commission fees. LPHI priced policies such that shorter LEs promised greater returns to purchasers. In order to ensure that policies were maintained during the insured's LE period, LPHI required purchasers to place a certain amount of funds in escrow, from which premium payments were to be made during this period. If an insured lived past his or her LE, the purchaser was required to make additional premium payments in order to keep the policy from lapsing. In addition to facilitating sales to institutional and individual purchasers, LPHI acquired interests in life insurance policies for its own investment portfolio.

Starting in 1999, LPHI obtained LEs from a sole service provider, Dr. Donald Cassidy, a board-certified oncologist and internal medicine physician. Cassidy calculated an insured's LE by using the Center for Disease Control

3

general population mortality table to determine the anticipated life span for the insured and adjusting that anticipated life span based on his medical judgment after reviewing the insured's medical records.  Cassidy reported his result in a range of years, and LPHI used the top end of the range as the insured's LE.  In public filings with the SEC, LPHI identified certain risks associated with its underestimation of LEs.  In March 2011, after the SEC launched an investigation regarding LPHI's LEs, the company started acquiring LEs from another provider, a company called 21st Services, in addition to Cassidy.

In 2013, the SEC brought an enforcement action against LPHI, Pardo, and Peden, alleging that they knowingly used materially underestimated, or "short," LEs in connection with life settlement policies and that they misrepresented an existing reality of materially and systematically short LEs as a contingent risk in LPHI's public filings with the SEC between 2007 and 2011.  The SEC claimed that the defendants violated the anti-fraud provisions in section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j, and section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a).  The SEC also contended that LPHI, aided and abetted by Pardo and Peden, violated the reporting requirements of section 13(a) of the Securities Exchange Act, 15 U.S.C. § 78m(a), and the SEC's rules thereunder, 17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-13.  As to Pardo only, the SEC alleged that he violated 17 C.F.R. § 240.13a-14.  Finally, the SEC asked that Pardo be ordered to reimburse LPHI for certain compensation and trading profits under section 304(a) of the Sarbanes-Oxley Act of 2002 (SOX), 15 U.S.C. § 7243(a).

At trial, Larry Rubin, the SEC's expert witness, testified that LPHI's LEs were materially and systematically short based on various analyses he

conducted using LPHI's data.[3]  Relevant to this appeal, the jury subsequently found that LPHI, Pardo, and Peden violated section 17(a) of the Securities Act, that LPHI violated section 13(a) of the Securities Exchange Act and rules thereunder, and that Pardo and Peden aided and abetted LPHI's section 13(a) violations.  However, the jury found that the defendants did not violate section 10(b) of the Securities Exchange Act.  The defendants then moved the district court for judgment as a matter of law.

Ultimately, the district court denied the defendants' motion for judgment as a matter of law as to section 13(a) violations, but it granted the motion for judgment as a matter of law as to section 17(a) violations and set aside the jury's verdict as to the latter.  The SEC moved for reconsideration of the court's section 17(a) ruling, but the district court denied that motion.  At the remedies stage, the district court imposed second-tier civil penalties on the defendants and issued injunctions restraining the defendants from committing additional violations of the relevant securities laws.  However, the district court declined to order Pardo to reimburse LPHI for compensation under section 304 of SOX and later denied the SEC's motion for reconsideration of this ruling.

The appellants, Pardo and Peden, challenge the district court's denial of judgment as a matter of law on the SEC's section 13(a) claim.  They also argue that the district court erred in imposing second-tier penalties, in assessing their amounts, and in issuing the injunctions.  The SEC cross-appeals, challenging the court's grant of judgment as a matter of law on the SEC's section 17(a) claim and the court's refusal to order SOX reimbursements.

---

[3] The defendants had moved to exclude Rubin's testimony as unreliable and irrelevant, but the district court ultimately denied their motion.

## II

We discuss the appellants' challenges, first to the jury's verdict and then to the district court's judgment, before turning to discuss the SEC's cross-appeal.

## A

The appellants challenge the jury's verdict that LPHI violated the reporting requirements of section 13(a) and that Pardo and Peden aided and abetted this violation, arguing that it was not supported by substantial evidence. As part of their challenge to the sufficiency of the evidence, the appellants contend that the district court abused its discretion in denying their motion to exclude the testimony of Rubin, the SEC's expert witness. We discuss this issue before turning to the assessment of the sufficiency of the evidence as a whole.

## 1

Rubin, the SEC's expert witness, is an actuary with thirty years of actuarial experience, specializing in the life settlement industry. Using data from LPHI, Rubin conducted different analyses, each leading him to conclude that LPHI's LEs were materially and systematically short. First, Rubin reviewed LPHI's "actual results" by conducting a cohort analysis of life insurance policies facilitated by LPHI; Rubin divided LPHI's portfolio of policies into separate groups according to year of issuance and analyzed the performance of each yearly cohort. Rubin testified that this analysis did not require actuarial training to conduct. Based on this analysis, Rubin concluded that the LEs LPHI used to facilitate the sale of life insurance policies were systematically and materially short, "[r]egardless of how policies are analyzed (e.g., length of life expectancy estimate, retail investors versus institutional

investors, pre-HIV/AIDS triple cocktail therapies versus post-HIV/AIDS triple cocktail therapies, [or] senior life settlements versus viaticals . . . )."

Next, Rubin conducted an "actual-to-expected," or "A/E," analysis, using actuarial methods and published mortality tables to compare the number of deaths expected based on the LEs at a given point in time to the actual number of deaths that occurred.  Based on this analysis, Rubin calculated an actual-to-expected performance ratio of 13% for the life settlements LPHI facilitated between 2004 and 2008.  Rubin explained that 100% would mean perfect performance, that 80% is considered very poor performance, and that in thirty years as an actuary he had never seen an A/E performance ratio as low as 13%.  Applying three standard deviations, Rubin calculated a 41% performance ratio with a 99% confidence that the actual ratio is no higher.

Finally, Rubin calculated "calibrated life expectancies."  He explained this analysis in the following way:

> To determine an appropriately developed life expectancy estimate or "calibrated life expectancy," I applied the actual to expected mortality ratio with the adjustment for three standard deviations described previously to the respective underlying mortality table (2005 CDC and 2008 VBT) and summed the resulting probability of survival from the age the policy was transferred to [LPHI] to the end of the valuation period (i.e., end of the particular calendar year) for each life.  The purpose of a calibrated life expectancy is to calculate and reflect appropriate adjustments to the initial life expectancy estimates using data gleaned from an underwriter's historical performance, as reflected by the underwriter's actual to expected mortality ratios.  These adjustments result in an A/E ratio of 100%.  This means given the three standard deviations, I am only 1% confident that the LEs used by [LPHI] are correct and 99% confident they are still too short.

No. 14-51353

Based on this analysis, again, Rubin concluded that LPHI's LEs for life settlements were materially and systematically short. In his deposition, Rubin indicated that his analysis was "governed by the Actuarial Standards Board" (ASB).

The appellants challenge the district court's admission of Rubin's expert testimony, arguing that it was both unreliable and irrelevant. "A trial judge has wide latitude in determining the admissibility of expert testimony . . . and his or her decision will not be disturbed on appeal unless 'manifestly erroneous.'" *Whitehouse Hotel Ltd. P'ship v. C.I.R.*, 615 F.3d 321, 330 (5th Cir. 2010) (alterations and some internal quotation marks omitted) (quoting *Watkins v. Telsmith, Inc.*, 121 F.3d 984, 988 (5th Cir. 1997)). "'Manifest error' is one that 'is plain and indisputable, and that amounts to a complete disregard of the controlling law.'" *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir. 2004) (quoting *Venegas-Hernandez v. Sonolux Records*, 370 F.3d 183, 195 (1st Cir. 2004)).

Expert testimony is admissible only "if it is both relevant and reliable." *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir. 2002) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993)). The reliability prong requires that an expert opinion "be grounded in the methods and procedures of science."[4] *Johnson v. Arkema, Inc.*, 685 F.3d 452, 459 (5th Cir. 2012) (internal quotation marks omitted) (quoting *Curtis v. M&S Petroleum, Inc.*,

---

[4] In *Daubert*, the Supreme Court provided "an illustrative, but not an exhaustive, list of factors that courts may use in evaluating the reliability of expert testimony:" (1) whether the theory or technique has been tested; (2) whether the theory or technique has been subjected to peer review; (3) the known or potential rate of error of the method used and the existence and maintenance of standards controlling the technique's operation; and (4) whether the theory or method has been generally accepted by the scientific community. *Pipitone*, 288 F.3d at 244; *see also Curtis v. M&S Petroleum, Inc.*, 174 F.3d 661, 669 (5th Cir. 1999).

174 F.3d 661, 668 (5th Cir. 1999)). "This requires some objective, independent validation of the expert's methodology." *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998) (en banc) (citing *Daubert v. Merrell-Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1316 (9th Cir. 1995) (on remand)). "The relevance prong requires the proponent to demonstrate that the expert's 'reasoning or methodology can be properly applied to the facts in issue.'" *United States v. Kuhrt*, 788 F.3d 403, 420 (5th Cir. 2015) (quoting *Curtis*, 174 F.3d at 668).

The appellants advance two basic arguments attacking the reliability of Rubin's expert opinion.  First, they argue that his opinion—particularly his A/E analysis—was not based on recognized methodologies that "had been tested, subjected to peer review and publication, or generally accepted by the life settlement provider industry."  Second, the appellants argue that Rubin's analysis relies on data from both viatical and life settlements, thereby "skew[ing] the results in 'favor' of the viatical policies that went long," and preventing him from offering a reliable evaluation of life-settlement LEs alone.

As to the recognition of Rubin's methodology, the lack of scientific consensus or peer review does not necessarily render expert testimony unreliable.  *Pipitone*, 288 F.3d at 246.  In *Daubert*, on remand from the Supreme Court, the Ninth Circuit held that an expert may satisfy the reliability prong by:

> explain[ing] precisely how they went about reaching their conclusions and point to some objective source—a learned treatise, the policy statement of a professional association, a published article in a reputable scientific journal or the like—to show that they have followed the scientific method, as it is practiced by (at least) a recognized minority of scientists in their field.

No. 14-51353

43 F.3d at 1319.[5]

Here, Rubin's report explains his different analyses in detail, and he has indicated that his analysis was governed by the ASB. The record includes an ASB document, a May 2013 "Exposure Draft" of a document titled, "Proposed Actuarial Standard of Practice: Life Settlements Mortality." This proposed standard of practice was subsequently adopted by the ASB with a few changes. *See* ACTUARIAL STANDARDS BD., ACTUARIAL STANDARD OF PRACTICE NO. 48: LIFE SETTLEMENTS MORTALITY ("ASOP 48"), at iv-v, *available at* http://goo.gl/i63ygl.[6]    Rubin's A/E analysis appears consistent with the recommendations contained in ASOP 48.

The appellants point to the ASB's May 2013 Exposure Draft, not to point out any discrepancies between Rubin's analyses and the ASB's then-proposed standard of practice, but to support their proposition that there were "no specific guidelines or practices for calculating A/E results in the life settlement industry." The appellants fail to recognize, however, that the ASB created the standard of practice for the purpose of "provid[ing] guidance to actuaries . . . evaluating mortality experience associated with life settlements." ASOP 48, at 1. This document is the kind of objective source referenced in *Daubert*, and it offers the opportunity to evaluate Rubin's analyses against a benchmark of an objective body's guidelines. *See* 43 F.3d at 1319.

Next, as to the appellants' argument that Rubin's analysis did not isolate the data relating to life settlements, Rubin clearly distinguishes between life

---

[5] As noted above, we have adopted the Ninth Circuit's requirement in *Daubert* of an objective, independent validation of the expert's methodology. *See Moore*, 151 F.3d at 276 (citing *Daubert*, 43 F.3d at 1316).

[6] We take judicial notice of the ASB's adoption of ASOP 48. *See United States v. Herrera-Ochoa*, 245 F.3d 495, 501 (5th Cir. 2001) (an appellate court may take judicial notice of facts, even if such facts were not noticed by the trial court).

settlements and viaticals in a number of places in his report and testimony. Rubin's report shows an analysis of A/E performance ratios and calibrated life expectancies for life settlements only. At trial, he also testified regarding the A/E ratio for life settlements only, as well as the average LPHI LE for life settlements. The appellants' challenge to Rubin's opinion as to LPHI's LEs for life settlements is therefore unfounded.

Accordingly, we find that the district court did not abuse its discretion in finding Rubin's opinion sufficiently reliable to be admitted. To the extent the appellants wish to dispute Rubin's conclusions, they had ample opportunity to cross-examine Rubin at trial and to introduce contrary evidence. *See Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

Turning to the relevance prong, the appellants argue that Rubin's expert opinion was irrelevant because he conducted a "hindsight, results-oriented analysis" without examining Cassidy's methodology. Citing *Turnbow v. Life Partners, Inc.*, 2013 U.S. Dist. LEXIS 97275 (N.D. Tex. July 9, 2013), the appellants argue that Rubin's analyses were not probative of the reasonableness of Cassidy's LEs and were therefore not relevant to the issues presented in this case. The SEC responds that Rubin's opinion is relevant to the issues involved in this case: whether LPHI's LEs were materially and systematically short and whether LPHI, Pardo, and Peden knew that they were so. The SEC argues that *Turnbow* is inapposite because the relevant issue there was whether LPHI "breached its fiduciary and/or contractual duties by using estimates produced by Dr. Cassidy," and answering that question "require[d] an examination of the reasonableness of Dr. Cassidy's methods, not an ex post facto analysis of the accuracy of Dr. Cassidy's results."

2013 U.S. Dist. LEXIS 97275, at *23.  We agree with the SEC on these points: the SEC's theory of the case at trial was that LPHI misrepresented the known fact that its LEs were short as an unmaterialized contingent risk.  Whether Cassidy's methodology was "reasonable" at the time is peripheral under this theory.  Rubin's opinion was certainly probative of the SEC's allegations that the LEs were materially short, which is at the heart of this case.  Thus, we find no abuse of discretion in the district court's determination that Rubin's opinion was relevant, and, overall, we find no abuse of discretion in the admission of Rubin's opinion.

**2**

The appellants argue that there was insufficient evidence to support the jury's verdict that LPHI violated the reporting requirements of section 13(a) of the Securities Exchange Act and that Pardo and Peden aided and abetted such violation.  The appellants therefore challenge the district court's denial of judgment as a matter of law as to this claim.

We review a district court's denial of a judgment as a matter of law de novo, applying the same standard the district court applied.  *MM Steel, L.P. v. JSW Steel (USA) Inc.*, 806 F.3d 835, 843 (5th Cir. 2015).  Courts may grant judgments as a matter of law only if the "facts and inferences point 'so strongly and overwhelmingly in the movant's favor that reasonable jurors could not reach a contrary conclusion.'"  *Id.* (quoting *EEOC v. Boh Bros. Constr. Co.*, 731 F.3d 444, 451 (5th Cir. 2013)).  We can reverse a denial of judgment as a matter of law only if "the jury's factual findings are not supported by substantial evidence or if the legal conclusions implied from the jury's verdict cannot in law be supported by those findings."  *Am. Home Assurance Co. v. United Space All., LLC*, 378 F.3d 482, 486–87 (5th Cir. 2004).  "Substantial evidence is

No. 14-51353

something more than 'a scintilla of evidence.'" *MM Steel*, 806 F.3d at 843 (*Hunnicutt v. Wright*, 986 F.2d 119, 122 (5th Cir. 1993)).

Section 13(a) and Rules 13a-1 and 13a-13 require issuers of registered securities to file with the SEC annual reports on Form 10-K and quarterly reports on Form 10-Q. 15 U.S.C. § 78m(a); 17 C.F.R. §§ 240.13a-1, 240.13a-13. Rule 12b-20 requires the issuer to disclose any material information as may be necessary to ensure that the reports are not misleading. 17 C.F.R. § 240.12b-20. Here, the SEC alleged that, from January 2007 through November 2011, LPHI and the appellants "misrepresented, failed to disclose, and/or made misleading omissions" in public filing with the SEC "regarding: (i) a material risk to the Company's business, (ii) a material trend impacting the Company's revenues, and (iii) the Company's revenue recognition policies." Specifically, as noted above, the SEC's primary theory at trial was that LPHI misrepresented the allegedly known fact that its LEs were short as an unmaterialized contingent risk.[7]

Section 20(e) of the Securities Exchange Act permits the SEC to bring an action against "any person that knowingly provides substantial assistance" to a primary violator of the securities laws.[8] 15 U.S.C. § 78t(e) (2006). To prove a violation of this section, the SEC must prove: (1) a primary violation of the

---

[7] In its brief on appeal, the SEC also briefly argues that the jury could have concluded that LPHI violated section 13(a) by misrepresenting the source of its LEs in claiming that "to foster the integrity of LPHI's pricing systems, [it used] both in-house and outside experts, including medical doctors and published actuarial data." However, beyond a conclusory assertion, the SEC makes no argument and cites no authority to establish that any such misrepresentation would have been material. This argument is therefore forfeited. *See, e.g.*, *L & A Contracting Co. v. S. Concrete Servs., Inc.*, 17 F.3d 106, 113 (5th Cir. 1994) (deeming a party's challenge abandoned for being inadequately briefed).

[8] The Dodd-Frank Act of 2010 amended Section 20(e) to add the words "or recklessly" after "knowingly." Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub.L. No. 111-203, 124 Stat. 1376, § 929O (codified at 15 U.S.C. § 78t(e)). In this case, the jury was instructed on the pre-Dodd-Frank version.

securities laws; (2) that the aider and abettor had knowledge of this violation and of his or her role in furthering it; and (3) that the aider and abettor knowingly provided substantial assistance in the commission of the primary violation.  *See Abbott v. Equity Group, Inc.*, 2 F.3d 613, 621 (5th Cir. 1993); *see also SEC v. Goble*, 682 F.3d 934, 947 (11th Cir. 2012); *SEC v. Shanahan*, 646 F.3d 536, 547 (8th Cir. 2011); *SEC v. DiBella*, 587 F.3d 553, 566 (2d Cir. 2009).

The appellants attack the jury's findings as to the first two elements, i.e., that LPHI violated section 13(a) and the SEC's rules thereunder by misrepresenting the risk that its LEs were short and that the appellants knew of this misrepresentation.  First, as to the finding of a primary violation by LPHI, the appellants argue that the SEC provided no competent evidence to establish that LPHI's LEs were short.  And, the appellants contend, even if LPHI's LEs were short, this does not establish a misrepresentation.  To establish a misrepresentation, they imply, the SEC had to prove that underestimated LEs actually harmed LPHI's business.  The appellants also claim that there was no misrepresentation because LPHI priced its policies to remain profitable even if the insured lived several years beyond his or her LE.

These arguments are meritless.  Rubin's testimony that LPHI's LEs were systematically and materially short was plainly sufficient for the jury to conclude that this was the case.  Moreover, in order to show that LPHI misrepresented a material risk to its business, as the SEC alleged, the SEC need not show that the relevant risk was actually realized.  *See SEC v. Recile*, 10 F.3d 1093, 1098 n.16 (5th Cir. 1993) ("[M]ateriality is defined as what a reasonable investor would consider important in making his investment decision."); *SEC v. Blavin*, 760 F.2d 706, 711 (6th Cir. 1985) ("[T]he Commission is not required to prove that . . . the misrepresentations caused any investor to lose money.").  Further, that LPHI's policies remained

profitable even when the insured lived past LE is irrelevant: when a policy exceeded LE, purchasers were required to pay additional premiums to maintain the policy and therefore received a lower rate of return; and LPHI recognized in its filings with the SEC that underestimation of LEs posed a risk to its business.

Second, the appellants argue that they had no knowledge of any violation of section 13(a) by LPHI because they did not know during the relevant time that the LEs LPHI used to facilitate its life settlements were short.  However, the record contains sufficient evidence to allow a reasonable fact finder to conclude that the appellants knew that LPHI's LEs were short.

Initially, there is evidence in the record tending to show that the appellants knew that the LEs LPHI used in life settlement policies were short.  In August 2008, Mark Embry, the company's chief information officer, conducted an analysis of life settlement transactions completed by LPHI in 2004.  Embry's analysis showed that out of thirty-seven policies sold in 2004, none had matured and twenty-one would exceed their LEs by the end of 2008.  Embry reported his findings to the appellants, noting that he does not "see any trends or anomalies that indicate 2004 as an off year."  Pardo replied, "Mark, this information is highly confidential and should not be distributed to anyone beyond those copied."  According to Embry's testimony, Pardo did not discuss the email or report with him further.  The appellants argue that Pardo's response to Embry indicated his concern that the data was not reliable; however, the jury was entitled to discredit this contention and conclude that

Pardo was aware that LPHI's life-settlement LEs were short but wished to conceal this information from the public.[9]

Moreover, this direct evidence of the appellants' knowledge of short life-settlement LEs is fortified by additional indirect evidence from which the jury could reasonably infer such knowledge. For instance, the record suggests the appellants had actual knowledge that the LEs LPHI used in viatical policies were short. In 2003, LPHI's audit committee expressed concern over "the small number of policies paying off during" the previous nine months and recommended that the board discuss with management the possibility of "obtaining an independent review" of LPHI's "underwriting criteria." Further, in May 2007, the Colorado Securities Commissioner initiated an enforcement action against LPI, alleging that viatical insureds outlived its LEs at a "high frequency rate." Lastly, Nina Piper, the company's chief financial officer, testified that she offered to "grade" Cassidy but Pardo told her not to do it. Nevertheless, in November 2007, on her own initiative and against Pardo's prior instruction, Piper conducted an analysis of all life insurance policies facilitated by LPHI from January 2002 through November 2007. According to Piper, her analysis showed that only two percent of the insureds died within Cassidy's LEs. She testified that she informed the appellants of her findings; Pardo turned away and appeared angry, and Peden later told her that they

---

[9] Pardo testified that he had asked the company's data department to check the data, but the only evidence in the record that the data was rechecked is an analysis Embry conducted in 2013, which according to Embry showed that his original analysis was wrong. At trial, the SEC attempted to impeach Embry's 2013 analysis, arguing that the document containing the analysis was "misrepresentative," but the district court disallowed the SEC's questioning, ruling that the document containing the analysis "speaks for itself." Regardless of the accuracy of Embry's later analysis, however, the jury could have reasonably inferred that his August 2008 analysis alerted Pardo and Peden to problems with LPHI's life-settlement LEs.

have "fixed the problem" by moving the company from viaticals to life settlements. Though it may be plausible that the appellants believed that the problem with Cassidy's LEs was isolated to viaticals, the jury reasonably could have inferred that the appellants knew that Cassidy's LEs were simply not reliable.

Moreover, record evidence suggests that LPHI and the appellants could easily have learned that LPHI's life-settlement LEs were short if they had assessed Cassidy's LEs for accuracy, but there is evidence suggesting that they consciously chose not to do so despite having concerns. The record shows that LPHI used a proprietary system called "LifeApps," which stored all the information regarding its life insurance policies, including Cassidy's LEs and the date of maturity, if and when available. LifeApps allowed LPHI to generate reports on the maturities of policies relative to LEs. And, as evidenced by his August 2008 analysis, Embry actually generated such reports using LifeApps. According to Rubin, the SEC's expert witness, in 2008, a simple analysis of LPHI's data would have made it "crystal clear they have a problem." As mentioned above, Piper testified that she offered to "grade" Cassidy but Pardo told her not to do so. Although one of the defendants' attorneys suggested, in cross-examining Piper, that Pardo simply thought Piper had "more important things to do," the jury could have reasonably inferred that Pardo wished to avoid assessments of Cassidy's LEs because he knew that such assessments would not be favorable.

Around November 2008, Peden became aware that several companies that provided actuarial LEs lengthened their LEs after concluding that their current calculations were producing short LEs. That month, Peden emailed himself a reminder to "call [C]assidy on accuracy." But Peden never called Cassidy to discuss whether the changes other LE providers have made affected

his LEs in any way.  Nevertheless, when an investment advisor asked Peden if the changes another LE provider made to its methodology affected LPHI, Peden replied that these change had no effect on LPHI "because our medical consultant uses a different methodology."  From these facts, too, the jury reasonably could have inferred that the appellants consciously chose not to evaluate Cassidy's LEs, even though they had concerns regarding their accuracy.

Overall, there is more than a scintilla of evidence in the record that LPHI and the appellants knew that LPHI's life-settlement LEs were materially short.  Coupled with the evidence that those LEs were, in fact, systematically and materially short, and that LPHI misrepresented this known fact as a mere potential risk, the evidence is sufficient to support the jury verdict that the appellants aided and abetted LPHI's violation of section 13(a) and Rules thereunder.  Accordingly, we affirm the district court's refusal to set aside the jury verdict on this issue.

## B

We now turn to consider the appellants' appeal of the district court's judgment.  They challenge the court's (1) imposition of second-tier civil penalties, (2) calculation of the number of violations to which they were held responsible, and (3) issuance of injunctions against them.  We discuss each of these challenges in turn.

## 1

We review the district court's imposition of civil penalties for an abuse of discretion.  *SEC v. United Energy Partners, Inc.*, 88 Fed. App'x. 744, 747 (5th Cir. 2004) (citing *R&W Tech. Serv. Ltd. v. CFTC*, 205 F.3d 165, 177 (5th Cir. 2000)).  The Securities Exchange Act provides a three-tiered, escalating structure for assessing civil penalties.  *See* 15 U.S.C. § 78u(d).  As relevant

here, first-tier penalties for natural persons are capped at either $6,500 or $7,500 for each violation, depending on the date of the relevant violation. *See* 15 U.S.C. § 78u(d)(3)(B)(i); 17 C.F.R. §§ 201.1003-04. Also as relevant here, second-tier penalties have a much higher cap, of $65,000 or §75,000, depending on the date of the violations. *See* 15 U.S.C. § 78u(d)(3)(B)(ii); 17 C.F.R. §§ 201.1003-04. Second-tier penalties may only be imposed for violations that involve "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement." 15 U.S.C. § 78u(d)(3)(B)(ii). The third tier is not implicated in this case.

Based upon the jury's verdict on the appellants' aiding and abetting of LPHI's violation of section 13(a) and rules thereunder, the district court assessed second-tier civil penalties of $6,161,843 against Pardo and $2,000,000 against Peden, finding that their conduct was, at the very least, reckless. The appellants argue that the district court erred in imposing second-tier penalties because the jury verdict did not establish any "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement" on their part, as the statute requires. 15 U.S.C. § 78u(d)(3)(B)(ii). They insist that, pursuant to the Seventh Amendment, only the jury can find the predicate facts for the imposition of second-tier violations. Citing *Tull v. United States*, 481 U.S. 412 (1987), the SEC argues in response that a jury need only determine the defendant's liability and that the actual amount of civil penalties is left to the discretion of the district court.

In *Tull*, the Supreme Court held that the Seventh Amendment grants a right to a jury trial on liability for civil penalties under the Clean Water Act,

33 U.S.C. §§ 1251, 1319(d),[10] *Tull*, 481 U.S. at 425, but determined that Congress could constitutionally authorize judges to assess the amount of civil penalties, *see Tull*, 481 U.S. at 426–27. Courts of appeals have since applied *Tull* in the context of civil penalties under the Securities Exchange Act as well. *See SEC v. Capital Sols. Monthly Income Fund, LP*, 818 F.3d 346, 354–55 (8th Cir. 2016) (defendant in securities action was entitled to a jury trial on liability but not on the amount of civil penalties); *SEC v. Lipson*, 278 F.3d 656, 662 (7th Cir. 2002) (same). At the remedies stage, trial judges may make factual findings and rely on such findings in assessing the amount of civil penalties so long as the court's findings do not conflict with the jury's findings as to liability. *See Capital Sols. Monthly Income Fund*, 818 F.3d at 354–55 (affirming civil penalties judgment because the defendant "has not shown how the district court's factual findings *conflict* with the jury's findings"); *Lipson*, 278 F.3d at at 662 ("[I]t was for the judge to decide, consistent with the jury's finding of liability, . . . the amount of the civil penalty.").

The appellants claim that the district court's finding that their conduct was reckless conflicts with the jury's finding that they were not liable for section 10(b) violations. Rather than conflict with the jury's verdict, however, the district court's finding of recklessness was required by it. As we noted above, to find that the appellants aided and abetted LPHI's violations of section 13(a), the jury had to find that they had knowledge of LPHI's violation and of their role in furthering it. *See Abbott v. Equity Group, Inc.*, 2 F.3d 613, 621 (5th Cir. 1993). And, as previously explained, the SEC's theory at trial was that LPHI violated section 13(a) by misrepresenting the known fact that its

---

[10] The Clean Water Act provided that violators of certain sections of the Act "shall be subject to a civil penalty not to exceed $10,000 per day" during the period of the violation. *Tull*, 481 U.S. at 414.

No. 14-51353

LEs were short as a contingent risk.  The appellants were LPHI's top officers and the ones who created, signed, and certified filings containing the relevant misrepresentations.  If the appellants had knowledge of LPHI's violations and of their role in furthering them, as the jury found, they also necessarily exhibited "deliberate or reckless disregard of a regulatory requirement."  15 U.S.C. § 78u(d)(3)(B)(ii).  Accordingly, we affirm the district court's imposition of second-tier penalties.

**2**

In assessing the amount of civil penalties, the district court determined that Pardo was responsible for sixty-eight individual violations and that Peden was responsible for eighty-five violations.  The district court reached these numbers by multiplying the number of statutory and regulatory provisions the appellants had violated by the number of LPHI's false filings with the SEC.

The appellants raise multiple challenges to the district court's calculations.  First, they argue that the jury verdict does not establish that it found more than a single violation in a single public filing.  The appellants highlight that the jury was only asked to decide whether LPHI (and therefore the appellants) committed "one or more violations of section 13(a)."  Thus, they contend that the district court could only have imposed penalties for a single violation.[11]

As we have explained in discussing the district court's imposition of second-tier penalties, the appellants had no Seventh Amendment right to a jury trial at the remedies stage of this securities action, and the court acted within its power to make factual findings not in conflict with the jury's verdict.

---

[11] The appellants make this argument notwithstanding the fact that they conceded in response to the SEC's requested penalties, below, that the district court could find as many as seventeen violations.

21

*See Tull*, 481 U.S. at 425; *Sols. Monthly Income Fund*, 818 F.3d at 354–55; *Lipson*, 278 F.3d at 662.  Thus, the jury's verdict, which established at least one violation of section 13(a) by the defendants, did not preclude a finding of multiple violations by the district court.

Next, the appellants contend that the district court abused its discretion in calculating the total number of violations for which each appellant was responsible by multiplying the number of false filings with the SEC by the number of statutes and rules those filings violated.  They claim that section 13(a) and the relevant rules thereunder cannot give rise to "discrete" violations because they are interdependent.

However, the appellants did not properly object to this calculation below.  In response to the SEC's contention below that Pardo and Peden were responsible for eighty-five and sixty-eight violations, respectively, the appellants argued, "In essence, . . . there is only one primary violation: the failure to disclose information in SEC reports.  At most, then, Defendants could be charged with no more than 17 violations."  This somewhat opaque objection to the application of the SEC's suggested calculation in the appellants' case was not sufficient to put the district court on notice of the appellants' broader claim on appeal that the district court's methodology was legally erroneous as a general matter.  *See United States v. Vontsteen*, 950 F.2d 1086, 1091 (5th Cir. 1992) (holding that general plea for leniency was not sufficient to put the district court on notice of the defendant's particular claim on appeal).

We review unpreserved challenges in civil cases for plain error.  *E.g.*, *Crawford v. Falcon Drilling Co.*, 131 F.3d 1120, 1123 (5th Cir. 1997).  To satisfy the plain-error standard, the appellants must show that (1) there was error; (2) the error was clear and obvious; (3) the error affected their substantial rights; and (4) the error seriously affects the fairness, integrity, or public

reputation of judicial proceedings. *See Puckett v. United States*, 556 U.S. 129, 135 (2009). Only if those four prongs are satisfied does this court have discretion to remedy the error. *See id.* We find no occasion to exercise such discretion in this case, as any error in the district court's use of the challenged methodology was not plain.

The relevant civil-penalty provision of the Securities Exchange Act provides maximum penalty amounts "for each violation," 15 U.S.C. § 78u(d)(3)(B), but the term "violation" is not defined in the statute. Neither below nor on appeal have the appellants pointed to any authority that stands for their position that section 13(a) and the SEC Rules thereunder cannot establish discrete violations under § 78u. The appellants therefore have not met their burden to establish a plain error. *See United States v. Jackson*, 549 F.3d 963, 978 (5th Cir. 2008) (a question of first impression cannot form the basis for plain error); *United States v. Hull*, 160 F.3d 265, 272 (5th Cir. 1998) (no plain error where proponent's theory requires extension of precedent).

Nevertheless, the SEC concedes that section 13(a) cannot serve as the basis for an independent violation in this case. It also concedes that the district court's calculation was flawed because it included purported violations of Rule 13a-1, which pertains to Form 10-Ks, in connection with Form 10-Qs and purported violations of Rule 13a-13, which pertains to Form 10-Qs, in connection with Form 10-Ks. In light of these concessions by the SEC, we vacate the district court's assessment of civil penalties against the appellants. We remand the case specifically for recalculation of the number of violations without the flaws conceded by the SEC and for reassessment of the amounts of civil penalties imposed on the appellants.

**3**

As part of its judgment, the district court granted injunctive relief, enjoining the appellants from future violations of section 13(a) and from aiding and abetting such violations through certain specified conduct.[12]   The appellants challenge these injunctions, arguing that there was no evidentiary basis to support the need for them and that they are impermissibly broad.

We review the grant of a permanent injunction for abuse of discretion. *SEC v. Gann*, 565 F.3d 932, 939 (5th Cir. 2009).   A permanent injunction is appropriate only if a "defendant's past conduct gives rise to an inference that, in light of present circumstances, there is a "'reasonable likelihood" of future transgressions.'" *Id.* at 940 (quoting *SEC v. Zale Corp.*, 650 F.2d 718, 720 (5th Cir. 1981)).   In deciding this issue, the court must consider "the (1) egregiousness of the defendant's conduct, (2) isolated or recurrent nature of the violation, (3) degree of scienter, (4) sincerity of [the] defendant's recognition of his transgression, and (5) likelihood of the defendant's job providing opportunities for future violations." *Id.* Applying these factors, the district court determined that the appellants' conduct was egregious, constituted a knowing or reckless violation of the securities laws, and was recurrent in that the appellants caused LPHI to file multiple misleading reports.  The court also recounted evidence that indicated the appellants' indifference to proceedings against them, in that they had taken no steps to correct obvious deficiencies in the management of LPHI even after the trial.

---

[12] Specifically, the district court's order restrains the appellants from "filing forms with the Commission containing false statements of material fact or failing to include material information that is necessary to make the statements not misleading" and from "knowingly providing substantial assistance to an issuer that fails to file timely with the Commission all accurate and complete information, documents, and reports required by the rules and regulations prescribed by the Commission."

The appellants argue that the SEC presented no evidence establishing a reasonable likelihood of future violations, noting that LPHI began using two sets of LEs in March 2011 and that the SEC failed to prevail on the vast majority of its claims below.  The appellants' arguments regarding this issue are meritless.  The cessation of the violations does not preclude a finding of reasonable likelihood of future violations, as it does not establish a lack of opportunities for future violations. *Gann*, 565 F.3d at 940.  And the appellants do not even address the district court's determinations regarding scienter, the recurrent nature of their violations, and their lack of remorse.  Accordingly, the district court did not abuse its discretion in concluding that there was a reasonable likelihood of future violations by the appellants.

As to the substance of the injunctions, the appellants argue that they are impermissible, overly broad, "obey-the-law" injunctions.  Federal Rule of Civil Procedure 65(d)(1) provides, "Every order granting an injunction . . . must set the reasons why it was issued; state its terms specifically; and describe in reasonable detail . . . the act or acts sought to be restrained or required."  Rule 65(d) therefore prohibits "general injunction[s] which in essence order[ ] a defendant to obey the law." *Meyer v. Brown & Root Constr. Co.*, 661 F.2d 369, 373 (5th Cir. 1981).

The appellants make no attempt to address the language of the district court's injunctions and explain, in light of relevant authority, why this language is overly broad.  Accordingly, they have forfeited their argument in this respect. *See, e.g.*, *L & A Contracting Co. v. S. Concrete Servs., Inc.*, 17 F.3d 106, 113 (5th Cir. 1994) (deeming a party's challenge abandoned for inadequate briefing).  At any rate, the district court's injunction is not overly broad.  "[I]njunctions are problematic when they order a defendant to obey the law but do not simultaneously indicate what law the defendant needs to obey." *In re*

*Rodriguez*, 695 F.3d 360, 369 (5th Cir. 2012) (citing *Meyer*, 661 F.2d at 373). They are not problematic when they order a defendant to obey a specific law. *See id.* (citing *Meyer*, 661 F.2d at 373). The district court's injunctions in this case ordered the appellants to obey section 13(a) by refraining from specified conduct. Accordingly, we affirm the district court's injunctions.

### III

We now reach the SEC's cross-appeal, which challenges the district court's setting aside of the jury's verdict as to section 17(a) as well as the court's refusal to order Pardo to make SOX reimbursements.

### A

As part of its allegations at trial, the SEC claimed that the appellants violated section 17(a) of the Securities Act. The SEC specifically alleged that, in public filings with the SEC in January and February of 2007, the appellants "misrepresented, failed to disclose, and/or made misleading omissions regarding [LPHI's] revenue recognition policy." Following trial, the jury found that LPHI and the appellants violated section 17(a). Ultimately, however, the district court granted the appellants' post-judgment motion for judgment as a matter of law as to this claim and set aside the verdict, finding that there was not "a single piece of evidence that support[ed] the jury's conclusion that [the appellants] violated Section 17 *in January and February of 2007* by misleading investors about LPHI's revenue recognition practices." The SEC moved for reconsideration, pointing to a January 2007 quarterly report and asserting that this public filing was sufficient to sustain the jury's section 17(a) verdict, but the district court denied the motion.

We review the district court's grant of judgment as a matter of law de novo, applying the same legal standards as the district court. *Hurst v. Lee Cty., Miss.*, 764 F.3d 480, 483 (5th Cir. 2014). As previously explained, courts may

grant judgments as a matter of law only if the "facts and inferences point 'so strongly and overwhelmingly in the movant's favor that reasonable jurors could not reach a contrary conclusion.'" *MM Steel, L.P. v. JSW Steel (USA) Inc.*, 806 F.3d 835, 843 (5th Cir. 2015) (quoting *EEOC v. Boh Bros. Constr. Co.*, 731 F.3d 444, 451 (5th Cir. 2013)). Judgment as a matter of law is appropriate where "the jury's factual findings are not supported by substantial evidence," *Am. Home Assurance Co. v. United Space All., LLC*, 378 F.3d 482, 486–87 (5th Cir. 2004), which means "something more than 'a scintilla of evidence,'" *MM Steel*, 806 F.3d at 843 (quoting *Hunnicutt v. Wright*, 986 F.2d 119, 122 (5th Cir. 1993)). In reviewing the district court's grant of judgment as a matter of law, we consider all of the evidence in the light most favorable to the SEC, the non-movant, drawing all factual inferences in its favor. *Meadows v. SEC*, 119 F.3d 1219, 1226 (5th Cir. 1997).

> Section 17(a) provides in pertinent part:
>
> It shall be unlawful for any person in the offer or sale of any securities . . .
>
> (1) to employ any device, scheme, or artifice to defraud, or
>
> (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made . . . not misleading, or
>
> (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. § 77q(a). Liability under section 17(a)(1) "attaches only upon a showing of severe recklessness." *Meadows*, 119 F.3d at 1226. However, a showing of negligence is sufficient to establish liability under sections 17(a)(2) and 17(a)(3). *Id.* at 1226 n.15.

On appeal, the SEC reurges that the January 2007 quarterly report was sufficient to support the jury's verdict. This quarterly report incorporated

LPHI's annual report for the prior fiscal year and advised that the quarterly report "should be read in conjunction with the financial statements and the summary of significant accounting policies and notes" in the annual report. The SEC argues that this quarterly report included the same kind of misleading information (or suffered from the same kind of misleading omissions) as the other filings from 2007 through 2011 that formed the basis for the jury's section 13(a) verdict.

The appellants attempt to distinguish the January 2007 filing from the other filings that supported the section 13(a) verdict based on its timing and the implication for the appellants' knowledge. According to the appellants, even assuming that they knew that LPHI's LEs were short in November 2011, for instance, they may not have known that this was the case in January 2007.

However, as the appellants themselves stressed at oral argument, unlike liability under section 17(a)(1), liability under section 17(a)(2) or 17(a)(3) does not require proof of scienter. Thus, the jury properly could have found that the appellants committed violations of section 17(a)(2) or 17(a)(3).[13] Consequently, we conclude that that the jury's verdict is supported by substantial evidence. The record shows: well before 2007, the appellants knew that they had a problem with viatical LEs; LPHI had the ability to easily assess the accuracy of its LEs; Piper offered to "grade" Cassidy's LEs, but Pardo instructed her not to do so; and Rubin testified that by 2007 it was "becoming clear" that LPHI had a problem with its life-settlement LEs. This is more than a scintilla of evidence that the appellants negligently misrepresented the risk of

---

[13] Though the jury's verdict form refers specifically to section 17(a)(1), the appellants concede that this was a clerical error and that the jury's finding pertained to section 17(a) generally.

underestimated LEs in its January 2007 quarterly report, which incorporated LPHI's prior annual report.

The appellants advance no other basis to set aside the jury's section 17(a) verdict. Accordingly, the jury's verdict must stand. We therefore reverse the district court's grant of judgment as a matter of law as to section 17(a) and remand for determination of appropriate remedies.

**B**

In 2011, LPHI restated its financial statements for fiscal years 2009 and 2010 because its prior quarterly and annual reports did not comply with generally accepted accounting principles (GAAP).[14] The restatement explained that LPHI's Board of Directors, Audit Committee, and management concluded that LPHI needed to restate its consolidated financial statements for 2009, 2010, and the first three quarters of 2011, to properly state, *inter alia*, investment in policies, which "had been incorrectly accounted for under [GAAP]." Investment in policies refers to the value of life insurance policies in LPHI's own investment portfolio.[15] LPHI further stated that its restatement of its consolidated financial reports was related, in part, to "impairment expense for owned policies."[16] Further explaining the adjustments for impairment expense, the restatement reported:

---

[14] Securities Exchange Act Rules 13a-1 and 13a-13 require issuers to file quarterly and annual reports in prescribed forms, and the prescribed forms, in turn, require that LPHI's reports include financial statements that comply with GAAP. *See SEC v. Jasper*, 678 F.3d 1116, 1120 (9th Cir. 2012) (Forms 10-Q and 10-K require financial statements "prepared in accordance with GAAP"); *see also* 17 C.F.R. § 210.4-01(a)(1) (GAAP noncompliant financial statements filed with the SEC are presumptively misleading unless the SEC provides otherwise).

[15] LPHI began acquiring interests in life insurance policies for its own portfolio in 2005. By February 28, 2011, LPHI held interests in over 1,300 policies with an aggregate face value of over $32,000,000.

[16] "Impairment is an accounting principle that describes a permanent reduction in the value of a company's asset . . . . When testing for impairment, the total profit, cash flow or

No. 14-51353

> We improved the method by which we calculate impairment on Investment in Policies. Impaired value is based on estimates of life expectancy and the effect of that determination on future premiums and the date of expected receipt of proceeds from policy maturities. We improved our methodology for estimating life expectancies by adding more actuarial data, and our application of the improved methodology generally increased life expectancies for the policies we held for investment.[17]

The restatement also contains an explanation of a disagreement between LPHI and Ernst & Young, its auditor, regarding LPHI's revenue recognition policy. The restatement indicates that LPHI accepted Ernst & Young's new position and applied the new revenue recognition policy both prospectively and in restating its prior financial statements.

Section 304(a) of SOX provides that "[i]f an issuer is required to prepare an accounting restatement due to the material noncompliance of the issuer, as a result of misconduct, with any financial reporting requirement under the securities laws, the chief executive officer . . . shall reimburse the issuer" for certain types of compensation and trading profits. 15 U.S.C. § 7243(a). The SEC asked the district court to order Pardo to reimburse LPHI $13,340,371 because the company issued accounting restatements due to material noncompliance with securities regulations. The SEC maintained that this material noncompliance was the result of misconduct, namely, the prior knowing use of understated LEs in calculating the impairment value of life

---

other benefit that's expected to be generated by a specific asset is periodically compared with that same asset's book value. If it's found that the book value of the asset exceeds the cash flow or benefit of the asset, the difference between the two is written off and the value of the asset declines on the company's balance sheet." Investopedia.com (Impairment), Investopedia Inc., *available at* http://www.investopedia.com/terms/i/impairment.asp (last accessed April 21, 2017).

[17] Starting in 2011, LPHI began using actuarial LEs purchased from a second provider, in addition to Cassidy's LEs.

settlements owned by LPHI.    The district court declined to order reimbursement under SOX, concluding that the evidence did not establish that LPHI's noncompliance with financial reporting requirements was caused by misconduct rather than by good faith reliance on its auditor.[18]  The SEC moved for reconsideration, but the district court denied the motion.  On appeal, the SEC challenges the district court's determination that LPHI's noncompliance was not necessarily caused by misconduct.

Causation is a question of fact this court reviews for clear error.  *Urbach v. United States*, 869 F.2d 829, 831 (5th Cir. 1989).  A district court's findings are clearly erroneous when they are not plausible in light of the record as a whole or when this court is "left with the definite and firm conviction that a mistake has been made." *Chemtech Royalty Assocs., L.P. v. United States*, 766 F.3d 453, 460 (5th Cir. 2014) (internal quotation marks omitted) (quoting *Streber v. Comm'r of Internal Revenue*, 138 F.3d 216, 219 (5th Cir. 1998)).

The SEC argues that LPHI's use of Cassidy's materially short LEs caused defects that made its financial statement GAAP noncompliant.  Specifically, it claims that LPHI's knowing use of materially short LEs to prepare its financial statements led to its reporting inaccurate results for its investment in policies and impairment of investments in policies.  LEs affected the purchase price and the amount of premiums that had to be paid to keep policies from lapsing, therefore factoring into the initial value of the policies.  LEs also factored into the determination of impairment because when an insured significantly exceeds LE, policy costs and projected future premiums exceed the estimated maturity value.    The SEC points out that LPHI's

---

[18]  There is no dispute that the remaining elements of section 304(a) were satisfied in this case.

"improved methodology" for calculating LEs had a dramatic effect on its impairment charges, increasing them from $151,810 to $2,255,698 in 2009 and from $281,882 to $2,139,183 in 2010. Thus, the SEC argues, LPHI's knowing use of materially short LEs caused its noncompliance with financial reporting requirements, leading to its obligation to issue a restatement. That LPHI may have been required to restate its revenues due to its auditor's change of position, the SEC contends, does not mean that LPHI was not also required to issue the restatements as a result of its prior use of materially short LES, which resulted in GAAP noncompliant statements.

In response, the appellants point primarily to LPHI's accession to Ernst & Young's position regarding revenue recognition policies, asserting that this was the cause for the restatement and thus that the district court did not err in concluding that the restatement resulted from good faith reliance on LPHI's auditor. As to the SEC's argument that LPHI's use of short LEs also required the restatement, the appellants posit that LPHI's adoption of improved LE methodologies and the use of updated LEs for determining asset impairment were not related to any issue with Cassidy's LEs. The appellants do not dispute the SEC's argument that the use of short LEs rendered the relevant financial reports GAAP noncompliant.

We agree with the SEC that LPHI's restatements were not required solely because of its good-faith reliance on LPHI's auditor. LPHI's knowing use of materially underestimated LEs rendered its financial statements noncompliant and thus also required a restatement. As the language of the statute makes clear, it is not the actual issuance of a restatement that must be caused by misconduct; rather, it is the *requirement* of a restatement that must be "due to the material noncompliance of the issuer, as a result of misconduct,"

No. 14-51353

with financial reporting requirements. 15 U.S.C. § 7243(a). LPHI's actual motivation in issuing the restatement is therefore of no moment.

At any rate, LPHI actually issued a restatement using "improved" methodologies to test for impairments, and this restatement explicitly tied these new methodologies to the changed calculations of impairment on investment in policies. The appellant's contention that the use of new methodologies—after the SEC had launched its investigation into LPHI's use of materially short LEs—had nothing to do with LPHI's prior knowing use of materially short LEs is highly implausible in light of the record.

Based on the foregoing, we see no basis in the record on which the district court could conclude that the restatements were not required by LPHI's misconduct in connection with its underestimated LEs; therefore, we conclude that the district court clearly erred in this respect. Accordingly, we reverse the district court's judgment and remand for the court to determine the appropriate amount of SOX reimbursements.

## IV

For the forgoing reasons, we AFFIRM the district court's denial of judgment as a matter of law on the SEC's section 13(a) claim; VACATE the district court's civil penalties; AFFIRM the district court's injunctions; REVERSE the district court's grant of judgment as a matter of law on the SEC's section 17(a)(1) claim; and REVERSE the district court's denial of SOX reimbursements as to Pardo. We remand the case for the district court to reassess the amounts of civil penalties, determine appropriate SOX reimbursement amounts, and provide appropriate remedy for the appellants' section 17(a) violations consistent with this opinion.