# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 15-70022

United States Court of Appeals
Fifth Circuit

**FILED**

March 21, 2018

Lyle W. Cayce
Clerk

STEPHEN DALE BARBEE,

Petitioner - Appellant

v.

LORIE DAVIS, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL
JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION,

Respondent - Appellee

Appeals from the United States District Court
for the Northern District of Texas
USDC No. 4:09-CV-74

Before DENNIS, PRADO, and ELROD, Circuit Judges.

PER CURIAM:*

Capital habeas petitioner Stephen Dale Barbee appeals the district court's denial of habeas relief, contending that he was denied effective assistance of trial counsel inasmuch as lead counsel conceded Barbee's culpability at summation. Barbee argues that his claim is governed by *United States v. Cronic*, 466 U.S. 648 (1984), which holds that if there has been such

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 15-70022

an abdication of advocacy that the prosecution's case was not subjected to meaningful testing, a defendant need not demonstrate that he was prejudiced by counsel's actions. Barbee further argues that even under *Strickland v. Washington*, 466 U.S. 668 (1984), which requires an applicant to show both objectively deficient performance and prejudice, he is entitled to relief. Barbee has not shown that the state habeas court's conclusions that his claim was governed by *Strickland*, rather than *Cronic*, or that he was not prejudiced by counsel's concession, were contrary to, or involved an unreasonable application of, clearly established federal law, or were based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *See* 28 U.S.C. § 2254(d). We thus AFFIRM the district court's denial of habeas relief.

## I

On February 19, 2005, Barbee was stopped by a sheriff's deputy walking along a service road in a wooded area. Barbee was wet and covered with mud. He gave a fake name and fled after the deputy questioned his identity. Later that day, police began to investigate the disappearance of Barbee's ex-girlfriend, Lisa Underwood, and her son, Jayden. Several days later, Lisa's car was found in a creek approximately 300 yards from where the sheriff's deputy had stopped Barbee. Police sought to talk to Barbee as a person of interest, and he agreed to come in to the police station for questioning.

According to a detective who testified at trial, Barbee admitted that he was the person who had run from the sheriff's deputy. In the midst of his recorded interrogation, Barbee took a bathroom break, and the detective escorted him. The detective testified that, while Barbee was in the bathroom, he admitted to conspiring with Ronald Dodd, his employee and the boyfriend of his ex-wife, to kill Lisa. According to the detective's testimony, Barbee, who

2

was married, said that he thought Lisa was going to "ruin his family [and] his relationship with his wife" by disclosing that he had fathered Lisa's unborn child. The detective testified that Barbee said that he and Dodd planned to drive over to Lisa's house together, and Barbee would "try to pick a fight" with Lisa, kill her, and then he and Dodd would use Lisa's car to dispose of her body. According to the detective, Barbee said that he was eventually successful in instigating a fight with Lisa and that he killed her by holding her face in the carpet until she stopped breathing. The detective testified that Barbee said Jayden came in while he was killing Lisa and that he then killed Jayden by holding his hand over Jayden's mouth.

After this unrecorded "bathroom confession," Barbee gave a recorded confession to the police, which was ultimately suppressed. He again admitted guilt while sitting in the interview room with his wife, Trish. Trish asked Barbee how he killed Lisa, and he said, "I held her down too long." Barbee then led the detective to the spot where Jayden and Lisa were buried. Barbee later recanted, saying that he confessed because the detective threatened him with the death penalty, and because Dodd threatened his family.

At trial, one of the prosecution's witnesses was a medical examiner who opined that Lisa had been smothered to death. On cross-examination, the medical examiner stated that a "person has less cardiovascular reserve while pregnant in the third trimester than at other times." He agreed that it was "fair" to say that the more pregnant a woman was, the less time it would take for her to suffocate, depending on how she was held. Defense counsel also elicited from the medical examiner that the fact that the death was ruled a "homicide" did not bear on intent, and that there was no evidence of "what was going on" in the "mind" of the person who held Lisa down until she asphyxiated. The medical examiner said that he was not sure how long Lisa had been held

3

down before she asphyxiated, but he thought it was "most likely at least two to three minutes." He said he could not "rule out" a shorter time frame, but he thought "it would be very unlikely." Counsel pressed him on the point of his uncertainty, eventually eliciting the following: "I think you're getting out of probability realm when you get below two minutes. But yeah, it could be 30 seconds. . . . I cannot absolutely rule that out."

In summation, defense counsel explained to the jury that the charge required them to find that Barbee had committed two knowing or intentional murders in the same transaction. He defined "intentionally" as having the "conscious objective or desire to achieve or cause the result," and "knowingly" as engaging in conduct "reasonably certain to cause the result." After attempting to impugn the testimony of the detective who testified about Barbee's bathroom confession, counsel conceded that Barbee killed both Jayden and Lisa, saying:

> As hard as it is to say, the evidence from the courtroom shows that Stephen Barbee killed Jayden Underwood. There is no evidence to the contrary.
>
> The problem in the capital murder case is the evidence in this courtroom that you heard doesn't show that Stephen Barbee had the conscious objective or desire or that he knew his conduct was reasonably certain to cause the result, those two definitions there.
>
> And it is supported by the testimony of [the medical examiner who] told you that he could not be sure when Lisa Underwood lost consciousness . . . .

Counsel concluded:

> There is evidence of a struggle inside that house. . . . It is not a one-sided fight. And Stephen Barbee's own words to his wife, it matches [sic]. That's the problem from their standpoint. What he told Trish Barbee is I held her down too long. That's exactly what matches the testimony of [the medical examiner]. And as hard as it is to do, I submit to you that the evidence in this case, the conclusive beyond-a-reasonable-doubt evidence, does not support

No. 15-70022

an intentional or knowing murder for Lisa Underwood. Was he there? Yes. Did he hold her down? Yes.

Did he know or intend that she was going to die or was that his conscious objective? The answer is no.

On February 27, 2006, the jury convicted Barbee of capital murder.

At the punishment phase, the State presented testimony from Barbee's ex-wife, Theresa Dowling, that Barbee had assaulted her during their marriage. Dowling also testified that Barbee confessed to her shortly after he confessed to the police. The State also presented testimony from a former coworker who claimed that Barbee verbally abused her after she refused his advances. Barbee presented testimony from friends, family, and acquaintances attesting to his good deeds and good character.[1] Barbee also presented testimony from a prison security expert who testified that Barbee would be able to successfully serve a life sentence, a confinement officer who knew Barbee well, and a confinement officer who had observed Barbee's good behavior while in jail. The jury ultimately sentenced Barbee to death.

After unsuccessfully seeking state post-conviction relief, Barbee filed this 28 U.S.C. § 2254 application, and was granted a stay so he could exhaust additional claims that had not been brought in his initial state habeas filing. Barbee filed a second state habeas petition asserting additional claims, all of which were dismissed or denied by the Texas Court of Criminal Appeals (TCCA). Upon return to the district court, the court denied relief and denied a certificate of appealability (COA).

This court granted a COA for Barbee's claim that counsel rendered ineffective assistance by conceding his culpability as to the conduct element of the offense at summation, but denied a COA as to the remainder of the claims

---

[1] Barbee's presentation at the punishment phase is discussed in further detail in this court's COA opinion. *See Barbee v. Davis*, 660 F. App'x 293, 318–19 (5th Cir. 2016).

he sought to appeal.  The parties filed supplemental briefs and presented oral argument, addressing the merits of Barbee's ineffective assistance of counsel claim.

## II

Under the Antiterrorism and Effective Death Penalty Act (AEDPA), Barbee can obtain federal habeas relief only if the adjudication of his claims in state court "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." *Robertson v. Cain*, 324 F.3d 297, 301–02 (5th Cir. 2003) (quoting 28 U.S.C. § 2254(d)(1)–(2)).  "Section 2254(d) thus demands an inquiry into whether a prisoner's 'claim' has been 'adjudicated on the merits' in state court; if it has, AEDPA's highly deferential standards kick in." *Davis v. Ayala*, 135 S. Ct. 2187, 2198 (2015) (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)).

"[A] state court's decision will be an unreasonable application of clearly established federal law whenever the state court identifies the correct governing legal principle from the Supreme Court's decisions but applies that principle to the facts of the prisoner's case in an 'objectively unreasonable' manner." *Robertson*, 324 F.3d at 302 (citing *Kutzner v. Johnson*, 242 F.3d 605, 608 (5th Cir. 2001)).  "[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by [the Supreme] Court." *Harrington*, 562 U.S. at 101.  "Under § 2254(d), a habeas court must determine what arguments or theories supported[,] or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists

could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the] Court." *Id.* at 102.

A state court's factual findings are "presumed to be correct," and an applicant has "the burden of rebutting the presumption of correctness by clear and convincing evidence." § 2254(e)(1). "The presumption of correctness not only applies to explicit findings of fact, but it also applies to those unarticulated findings which are necessary to the state court's conclusions of mixed law and fact." *Valdez v. Cockrell*, 274 F.3d 941, 948 n.11 (5th Cir. 2001). The state court's conclusion that counsel rendered effective assistance "is a mixed question of law and fact." *See Strickland*, 466 U.S. at 698.

## III

Barbee argues that his claim is governed by *Cronic*, which holds that when there is a "breakdown of the adversarial process," prejudice is presumed. 466 U.S. at 657–58. Alternatively, Barbee argues that counsel's summation amounted to ineffective assistance of counsel under *Strickland* "because trial counsels' 'strategy' of an accidental death was based on a misunderstanding of the law," was not supported by the evidence, and was not accompanied by evidence of Barbee's low risk of future dangerousness.

## A

In *Cronic*, the Supreme Court held that where "counsel entirely fails to subject the prosecution's case" to meaningful testing, "the adversary process itself [is] presumptively unreliable," and a defendant, therefore, need not demonstrate the impact of the failure in order to succeed on his claim. *Id.* at 658–59. The Supreme Court has described *Cronic* as "a narrow exception to *Strickland*'s holding that a defendant who asserts ineffective assistance of counsel must demonstrate not only that his attorney's performance was

deficient, but also that the deficiency prejudiced the defense." *Florida v. Nixon*, 543 U.S. 175, 190 (2004).

The Supreme Court has held that *Cronic* was inapplicable even where counsel failed to adduce mitigating evidence and waived closing argument, explaining, "When we spoke in *Cronic* of the possibility of presuming prejudice based on an attorney's failure to test the prosecutor's case, we indicated that the attorney's failure must be complete." *See Bell v. Cone*, 535 U.S. 685, 696–97 (2002). Similarly, this court held that *Cronic* was inapplicable where counsel conceded that a defendant committed murder, but not capital murder, over the defendant's objections, *Haynes v. Cain*, 298 F.3d 375, 381–82 (5th Cir. 2002) (en banc), explaining that "defense counsel must *entirely* fail to subject the prosecution's case to meaningful adversarial testing for the *Cronic* exception to apply," *id.* at 381 (citing *Gochicoa v. Johnson*, 238 F.3d 278, 285 (5th Cir. 2000)).

In *Florida v. Nixon*, the Supreme Court held that even defense counsel's full concession of guilt is not necessarily an indication that "counsel has entirely failed to function as the client's advocate," and that the *Strickland* standard applies to cases in which counsel informs the client of her strategic decision to concede guilt and focus on the penalty phase. *Nixon*, 543 U.S. at 189–91. *Nixon* suggests that most tactical decisions by counsel will be subject to the *Strickland* ineffective-assistance-of-counsel analysis, rather than the *Cronic* structural-error analysis, whether or not they involve an admission of guilt. *Nixon* also suggests that the fact that a client has not approved of a strategy does not necessarily trigger the application of *Cronic*: "When counsel informs the defendant of the strategy counsel believe[d] to be in the defendant's best interest and the defendant is unresponsive, counsel's strategic choice is

not impeded by any blanket rule demanding defendant's explicit consent." *Nixon*, 543 U.S. at 192.

The state habeas court determined, without analysis, that *Strickland*, rather than *Cronic*, applied to Barbee's ineffective assistance claim. Barbee argues that his counsel's concession of guilt "resembles the complete breakdown in the adversarial process that *Cronic* envisions" inasmuch as counsel's theory was "both unsupported by defense evidence and contrary to the coroner's testimony." He contends that *Nixon* is distinguishable as, in that case, "there was overwhelming evidence of Nixon's guilt and other factors not present here." Finally, Barbee asserts that *Cronic* should apply to his claim because counsel's closing argument in this case was the "functional equivalent" of an involuntary guilty plea or coerced confession.

Barbee attempts to distinguish *Nixon*, inter alia, on the grounds that Barbee "received no meaningful guilt-phase advocacy" and his counsel's concession was the "functional equivalent of a guilty plea." However, as compared with the defendant in *Nixon*, Barbee received at least as much if not more "meaningful" guilt-phase advocacy. Nixon's attorney determined that, "given the strength of the evidence, [his client's] guilt was not subject to any reasonable dispute." *Nixon*, 543 U.S. at 180–81. As a result, counsel "cross-examined [State] witnesses only when he felt their statements needed clarification . . . and he did not present a defense case," although he objected to the introduction of crime scene photographs and "actively contested several aspects of the jury instructions during the charge conference." *Id.* at 183.

By contrast, Barbee's counsel hired a false confession expert to analyze Barbee's confessions; sought to discredit the unrecorded bathroom confession and the police report documenting that confession; sought to exclude Barbee's inculpatory statements (successfully, in the case of Barbee's recorded

No. 15-70022

confession to detectives); and extensively cross-examined prosecution witnesses. Moreover, in *Nixon*, counsel fully conceded his client's guilt as to all elements "beyond any doubt," 543 U.S. at 182, while Barbee's counsel argued that "the evidence in this case, the conclusive beyond-a-reasonable-doubt evidence, does not support an intentional or knowing murder for Lisa Underwood."

Barbee contends that counsel's accidental-death theory would not have removed the possibility of being convicted for capital murder under the jury charge. In Texas, intentional murder requires intent as to the *result* of the conduct, not just the conduct. *See Martinez v. State*, 763 S.W.2d 413, 419 (Tex. Crim. App. 1988) (en banc) ("Intentional murder . . . is a 'result of conduct' offense; that is, not only must an accused be found to have intended to engage in the act that caused the death, he must also have specifically intended that death result from that conduct."). However, the definition of "intentional" in the jury charge included the "conscious objective or desire to engage in the conduct."

While the jury charge definition of "intentional" may have erroneously suggested to the jury that it only needed to find "intent" as to Barbee's conduct, the full jury charge suggested that "intentionally" applied to "cause[d] the death,"[2] indicating that the jury did not apply the instruction in a legally impermissible way. *See Cupp v. Naughten*, 414 U.S. 141, 146–47 (1973) ("[A]

---

[2] The charge instructed the jury to find Barbee guilty if it found that he

intentionally or knowingly cause[d] the death of an individual, Lisa Underwood[,] by smothering her with the weight of his body or with an object unknown to the Grand Jury or by a combination of the two, and during the same crimonal [sic] transaction, [Barbee] intentionally or knowingly caused the death of another individual, Jayden Underwood, by smothering him with his hand or by means unknown to the Grand Jury or by a combination of the two.

10

single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge."). Indeed, the TCCA has rejected a challenge to a jury charge similar to Barbee's, finding that in the phrase "intentionally or knowingly cause the death," "[t]he terms 'intentionally' and 'knowingly' directly modif[ied] the phrase 'cause the death'" and it was therefore "obvious that the 'result of conduct' and 'cause the result' language are the applicable portions of the full code definitions." *Velez v. State*, No. AP-76,051, 2012 Tex. Crim. App. Unpub. LEXIS 607, at \*79–80 (Tex. Crim. App. June 13, 2012).

Furthermore, counsel's argument unambiguously reflected a "result of conduct" understanding of mens rea, an understanding that was not contradicted by the prosecutor. *Cf. Kinnamon v. Scott*, 33 F.3d 462, 465–66 (5th Cir. 1994) (finding "no reasonable likelihood that the jury applied" a charge "in a constitutionally impermissible way" where, inter alia, "[t]he prosecutor did not attempt to exploit any uncertainty in the charge"). Therefore, Barbee has not shown it was unreasonable for the state habeas court to conclude that counsel's concession was a "defensive theory," rather than a full concession that Barbee committed capital murder.[3]    *See* § 2254(d)(2).

---

[3] Barbee also claims that he could have been found guilty under counsel's theory based on the definition of "knowingly" in the jury charge, which included "aware[ness] of the nature of his conduct" and "aware[ness] that his conduct is reasonably certain to cause the result." However, Barbee does not explain how the jury could have accepted counsel's theory that Barbee accidentally held Lisa down too long and also found that he was "reasonably certain" that he was killing her. Finally, Barbee contends that he could have been convicted of capital murder based on the intentional murder of Jayden, because even Lisa's accidental killing would constitute "murder" under other sections of the Texas Penal Code. However, Barbee's indictment and jury charge stated that both murders were intentional or knowing. Thus, the jury could not have convicted him under this theory. *See, e.g.*, *Ross v. State*, 487 S.W.2d 744, 745 (Tex. Crim. App. 1972) (reversing conviction where jury "charge erroneously authorized the [defendant's] conviction under a theory not charged in the indictment").

No. 15-70022

Barbee next argues that this case is distinguishable from *Nixon* because the evidence against Barbee was not as strong as the evidence against Nixon. However here, as in *Nixon*, counsel faced significant evidence of their client's guilt. Such evidence included the testimony of a police detective that Barbee confessed to him and the recorded inculpatory statements Barbee made to his wife, which were played for the jury. Barbee also led the police to the bodies and exhibited specific knowledge about the burial sites. Further, Barbee had a motive to kill Lisa, as he had been unfaithful to his wife and Lisa was pressuring him to admit it. In light of the strength of the prosecution's case, counsel's concession appears to have been a calculated strategy to elicit an acquittal.[4]

As to Barbee's argument that counsel's theory was entirely unfounded, it is not unreasonable to conclude that the record does, in fact, support counsel's theory. *See* § 2254(d). The medical examiner said that he was not sure how long Lisa would have been held down before she asphyxiated, eventually conceding he could not rule out that she had only been held down for thirty seconds. This theory was also consistent with Barbee's recorded statement to his wife, which suggested that he killed Lisa accidentally.

Finally, Barbee makes a number of arguments in support of his assertion that counsel was obligated to obtain his consent before conceding his guilt. The record does support that Barbee was not "fully" consulted or, at least, did not expressly consent to the strategy. During the state habeas proceedings, trial counsel testified that he told Barbee that he planned to pursue the accidental-death theory. But counsel also testified that he did not specifically ask for

---

[4] We note that, under *Nixon*, even counsel's concession that her client committed capital murder may be a strategic decision. 543 U.S. at 190–91 (observing that *Cronic*'s application, vel non, is influenced by "the gravity of the potential sentence in a capital trial and the proceeding's two-phase structure").

Barbee's permission to proceed with the theory and that Barbee did not want to sign a strategy memo explaining the theory. Barbee stated in a 2010 declaration that he "was shocked" when he heard counsel's summation because counsel "never told [Barbee] he was going to say this."

*Nixon* holds that counsel need not obtain affirmative consent to concede guilt. *See* 543 U.S. at 189. *Nixon* suggests that counsel's consultation played a role in that holding, but does not establish that *Cronic* necessarily applies when counsel pursue a strategy in the absence of full consultation, or in circumstances suggesting that a client would disagree with that strategy. *See id.* (stating counsel "was obliged to . . . explain his proposed trial strategy to Nixon"). And Barbee does not cite any Supreme Court case that so held.[5] Given the unsettled nature of the law on this point, we cannot say that the absence of full consultation or consent supports that the state habeas court's adjudication of this claim was contrary to, or an unreasonable application of, clearly established Supreme Court precedent. *See* § 2254(d)(1). And, given the ambiguity of the record, we cannot say that the state court made an unreasonable determination of the facts in light of the evidence presented. *See* § 2254(d)(2). As Barbee has not shown that he is entitled to habeas relief on the basis of *Cronic* under the deferential standards imposed by AEDPA, we now turn to the reasonableness of the state court's application of *Strickland*.[6]

---

[5] In fact, there is circuit precedent to the contrary. *See United States v. Thomas*, 417 F.3d 1053, 1059 (9th Cir. 2005) ("[F]ailure to consult and obtain consent in and of itself does not render [counsel's] strategic decision presumptively prejudicial.").

[6] We recognize that the Supreme Court will likely provide additional guidance in its decision in *McCoy v. Louisiana*. *See State v. McCoy*, 218 So. 3d 535 (La. 2016), *cert. granted*, 138 S. Ct. 53 (2017). However, AEDPA requires that we evaluate Barbee's application based on the law that was clearly established at the time of the state-court adjudication. *See Greene v. Fisher*, 565 U.S. 34, 38 (2011). As *McCoy* is a direct appeal, *see* 138 S. Ct. 53, the Court is not likely to shed light on the precise question before us: whether the state habeas court's resolution of Barbee's ineffective assistance of counsel claim was unreasonable in light of

No. 15-70022

**B**

To establish an ineffective-assistance-of-counsel claim under *Strickland v. Washington*, Barbee must "show that counsel's performance was deficient" and demonstrate "that the deficient performance prejudiced the defense." 466 U.S. at 687. With respect to deficient performance, Barbee "must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. To demonstrate prejudice, Barbee "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. Because his claim is governed by AEDPA, Barbee must show that the state habeas court's adjudication of his *Strickland* claim "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," or that it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." § 2254(d).

The state habeas court found that Barbee failed to show deficient performance because, it concluded, counsel's tactic was reasonable in light of the evidence and the circumstances. The court further found that Barbee had not established prejudice, finding that Barbee's alternative theory was not supported by the evidence and therefore "was not a viable jury argument."

Assuming without deciding that counsel's performance was deficient under these circumstances, we conclude, as explained below, that Barbee has not shown that it was unreasonable for the state habeas court to determine that he was not prejudiced by counsel's closing argument. *See id.*; *Strickland*, 466 U.S. at 691 ("An error by counsel, even if professionally unreasonable, does

---

clearly established law at the time of its ruling. *See* § 2254(d). We therefore decline to withhold our judgment pending the Court's decision in *McCoy*.

not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment.").

Barbee first argues that he was prejudiced by counsel's concession because it removed any "lingering juror uncertainty" about his guilt. He contends that this is one of the most important factors that leads jurors to impose a life sentence rather than death, and that lingering doubt "was an important factor [in his case], as no forensic evidence tied Barbee to the crime and there was evidence of Ron Dodd's culpability." However, Barbee points to no caselaw in support of his position that residual doubt at the punishment phase is a viable prejudice theory, let alone "clearly established Federal law, as determined by the Supreme Court of the United States." *See* § 2254(d)(1). And, in any event, Barbee's case for lingering doubt at the punishment phase is not persuasive given the considerable record support for his guilt: in addition to the evidence of guilt discussed above, Barbee's ex-wife, Theresa Dowling, testified at the punishment phase that Barbee called her the night of the murders and confessed to accidentally killing Lisa by holding her down too long, and to accidentally killing Jayden in an effort to keep him quiet. Thus, Barbee has not shown it was unreasonable for the state court to conclude he was not prejudiced in this respect. *See* § 2254(d).

Barbee next claims that the accidental-death theory ran counter to the medical examiner's testimony, causing counsel to lose considerable credibility with the jury at the punishment phase. Again, Barbee points to no caselaw in support of his contention that loss of credibility with the jury can support *Strickland* prejudice. Moreover, as discussed above, counsel's strategy was not without support. The medical examiner testified that he was not entirely sure how long Lisa would have been held down before she asphyxiated, eventually conceding he could not rule out that she had only been held down for thirty

15

seconds.    While the jury may not have thought it likely that Barbee had accidentally killed Lisa in light of the medical examiner's statements, the theory was not "counter to" his statements.    This theory was also consistent with Barbee's recorded statement to his wife that he "held [Lisa] down too long" and with Dowling's testimony that Barbee confessed to accidentally killing Lisa.   Barbee's brief argument points to nothing tending to show that the jury's distrust of counsel swayed its decisions at the penalty phase.   This argument is, therefore, also unavailing.[7]

Finally, Barbee suggests that he was prejudiced by counsel's failure to present the theory that Ronald Dodd committed the murders instead of the accidental death theory.   Counsel stated that their efforts to pursue a different defense strategy were hampered by Barbee's shifting version of events and by his "refus[al] to testify."    Barbee argued in his COA brief that it was unreasonable for the state habeas court to credit this statement because the record shows that Barbee was always steadfast in his assertions to counsel that he was innocent of both murders.   Even if Barbee consistently maintained complete innocence to counsel, the record does show that proceeding with a theory of actual innocence would have been challenging given his recorded conversation with his wife in which he stated, "I held her down too long." Barbee declined to testify to explain what he contends were false confessions. This lends credence to trial counsel's statements that it would have been

---

[7] Barbee contends that, as a result of counsel's concession at summation, counsel failed to present evidence that Barbee would not be a future danger.   Barbee argues that this was prejudicial because, at the time, he was "a 38-year old successful business owner with absolutely no prior criminal record."   Barbee does not explain how counsel's concession led to their failure to present evidence that Barbee would not be a future danger.   Thus, this argument is forfeited for inadequate briefing. *See, e.g.*, *SEC v. Life Partners Holdings, Inc.*, 854 F.3d 765, 784 (5th Cir. 2017).

16

difficult to present an "actual innocence" theory rather than a "legal innocence" theory.

Moreover, the only alternative defense Barbee proposes is that Dodd committed the murders. The state habeas court found, "The 'Ron Dodd did it' theory was not a viable jury argument." That court pointed to Barbee's confessions, his admitted presence near the place Lisa's car was found, and his knowledge of the location of the bodies as evidence inconsistent with the theory that Dodd committed the murders.

Barbee gave the following version of events in a 2010 declaration in support of his alterative theory of the crime: On the evening of February 18, 2005, Barbee was at Dowling and Dodd's house and asked Dodd to accompany him to Lisa's house, as he "wanted to see how she was doing." Dodd drove Barbee to Lisa's house and dropped him off. Barbee later called Dodd, who came to pick him up, and they returned to Dowling's house together. Dodd asked if Barbee wanted Dodd to talk to Lisa about getting a paternity test, and Barbee agreed, so they drove back to Lisa's house together. Barbee stayed in Dodd's truck while Dodd entered Lisa's house because he did not want Lisa to see that he had been crying. Dodd was inside the house for fifteen or twenty minutes, then came out and said, "Your problems are solved, go get her truck."

Barbee claims not to have understood what Dodd meant, but he got out of Dodd's truck, went to the door of Lisa's house, and Dodd drove off. Barbee went into the house and found Lisa and Jayden dead. He "panicked as [he] thought [he] was going to be blamed for it." He put the bodies in Lisa's vehicle and drove away. Barbee called Dodd, who met him and helped him remove the bodies from the vehicle. Dodd threw a shovel to Barbee and left. After burying the bodies, Barbee called Dodd, who agreed to pick him up on the highway. While on the way to meet Dodd, Barbee was stopped by a deputy sheriff. He

gave the deputy a false name and fled.  He met Dodd and they returned to Dowling's house where Dowling washed Dodd's clothing.

Barbee claims that he has adduced significant evidence in support of this theory, namely: (1) the affidavit of Dowling's father, who said, "[m]y son Danny Dowling told me that Ron Dodd had told him right after the murders that he had to punch Lisa in the face 25–26 times before 'the fucking bitch would go down,'" and a declaration from a post-conviction investigator stating that "both Jerry Dowling and his son Danny Dowling had said that Ron Dodd said he had to punch Lisa Underwood 25–26 [times] in the face before the 'fucking bitch would go down'"; (2) Dowling's statement to the investigator that she washed Dodd's clothes on the night of the murders and Dodd's statement to the investigator that he had his vehicle power-washed shortly thereafter; (3) a statement from Barbee's niece that Dowling, who was living with Dodd, often told her "how much she hated him [Barbee] and wanted him 'gone'"; (4) evidence of Dowling and Dodd's financial motive to frame Barbee for murder;[8] (5) evidence of "financial misdeeds" by Dowling that would have provided additional motive for Dodd to have framed Barbee; (6) Dodd's history of criminal violence; (7) evidence that Barbee would avoid physical confrontations; and (8) evidence that points to the falsity of Barbee's confession.  Even assuming that this evidence is properly before us, it does not show that the Dodd theory was more likely to succeed than the accident theory.

With regard to the purported confession from Dodd to Danny Dowling, there is no first-hand statement from Danny.  And it is neither clear that Danny would have testified, nor that his testimony would have been favorable

---

[8] Barbee obtained a declaration from his mother as well as a statement from an investigator to the effect that Dowling and Dodd had a financial motive to have Barbee out of the way, including a $500,000 "bonding policy" that Dowling purportedly converted to a "universal life insurance policy" with Dowling as the sole beneficiary.

to Barbee's theory: When the post-conviction investigator asked Danny who had made the statement about punching Lisa, Danny said that "he just couldn't remember, and didn't want anything to do with this case."

Dowling's statement that Dodd wanted his clothes washed the night of the murders and Dodd's statement that he had his vehicle power-washed shortly after the murders are just as consistent with Barbee's confession as they are with his exculpatory version of events, as in both versions he alleged that Dodd helped him bury the bodies. These statements are also second-hand, coming from an investigator's report.

The evidence of pecuniary interests and Dowling's dislike of Barbee perhaps tend to show that Dowling and Dodd had a motive to murder Barbee, but not that they had a motive to murder Lisa and Jayden. And even if they had a motive to frame Barbee by killing the Underwoods, Barbee had a more plausible motive to kill Lisa inasmuch as she was demanding that he tell his wife about the pregnancy.

Dodd's criminal history reflects that he had several prior convictions for assault and harassment. But Texas's evidentiary rules, as a general matter, prohibit propensity evidence. *See* TEX. R. EVID. 404(b). And even if it were admissible, this evidence has little probative value.

Barbee's evidence that he would "avoid physical confrontations" also has little probative value,[9] and it is contradicted by Dowling's testimony that she and Barbee had multiple physical fights when they were married, and that on one occasion he followed a driver and attempted to "get out to hit" the driver.

---

[9] Barbee points to a statement from a schoolmate saying, "I have had no contact with [Barbee] since high school, [but] based on my knowledge of him when he was young, I do not think [Barbee] has a high probability of committing future violent acts"; a statement from his aunt that he "was never abusive" and would "walk away from any kind of confrontation"; and a statement from the girlfriend of a former roommate, who saw Barbee "every weekend for a period of about 2–3 months" and "never saw [Barbee] angry."

No. 15-70022

Barbee's evidence with respect to the purported falsity of his confession includes his own declaration that he was coerced into confessing by the police; a declaration from his niece, in which she says that Barbee told her he confessed to protect his family because Dodd threatened to hurt them; and the declaration of an author who states that Barbee confessed because "Dodd had threatened to hurt his family." These statements all originate with Barbee, and none of them fully explains why he would have confessed to his wife.

In light of the weakness of the evidence supporting his alternative-suspect theory and the strength of the evidence against him, it was not unreasonable for the state habeas court to conclude that Barbee's alternative-suspect theory was not a "viable jury argument." Accordingly, Barbee has not demonstrated that it was unreasonable for the state habeas court to find that Barbee was not prejudiced by counsel's closing argument. *See* § 2254(d).

**\*\*\***

For these reasons, we AFFIRM the district court's denial of habeas relief.

20